■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JEROME McCLOSKEY, Appellant. THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v FRANCIS McCLOSKEY, Appellant. — Appeals from judgments of the County Court of Ulster County (Vogt, J.), rendered June 26, 1981, upon a verdict

convicting defendant Jerome McCloskey of the crimes of manslaughter in the first degree and assault in the third degree, and convicting defendant Francis McCloskey of the crimes of manslaughter in the second degree and assault in the third degree. There was evidence from which the jury could have found the following chain of events surrounding the homicide and assault for which defendants stand convicted: on the evening of November 28, 1980, Robert Millett, Sr., his wife, and son, Robert Millett, Jr., were driving home when they were harassed by defendants who were "tailgating" the Millett automobile. Eventually, Mr. Millett pulled over to permit the McCloskey car to pass, and both vehicles continued driving in the same direction. The Milletts observed the McCloskey car stop in front of a local tavern. Millett drew up behind them and walked over to the driver's side of the McCloskey vehicle where defendant Jerome McCloskey was seated. Jerome McCloskey got out and, after a heated verbal exchange, physically attacked the senior Millett, knocking him unconscious to the ground by a punch or kick to the head. Jerome McCloskey then relentlessly continued to kick and punch the defenseless victim. Defendant Francis McCloskey also got out of the car, assaulted Robert Millett, Jr., and then joined in striking the prostrate body of the senior Millett. Both defendants then shifted their attack to Robert Millett, Jr., until they were stopped through the intercession of Mrs. Millett and other onlookers. Defendants then fled. The victim never regained consciousness and expired four days later at Albany Medical Center. The pathologist who performed the autopsy found that death was caused by extensive brain injuries, including a massive fracture of the skull and three massive hemorrhages. The foregoing facts amply support the jury's verdict finding defendants guilty of manslaughter in causing the death of the senior Millett and of assault against his son. Contrary to defendants' contentions, there is nothing inconsistent in the jury's verdict convicting defendant Jerome McCloskey of manslaughter in the first degree while finding defendant Francis McCloskey guilty of manslaughter in the second degree. The jury could reasonably have ascribed the higher degree of mental culpability required of manslaughter in the first degree to defendant Jerome McCloskey because of the greater extent and length of his participation in the attack upon the deceased, as described by the eyewitnesses. Regarding the conduct of the trial, defendants' major ground for reversal is directed to allegedly prejudicial remarks by the prosecutor made during the course of his summation. Defendants' criticism centers upon four references in the prosecutor's closing statement: (1) his characterization of the case as being as "simple as the Fifth Commandment, Thou shall not kill"; (2) his assertion that the evidence sustained the Grand Jury's finding that defendants acted with "depraved indifference to human life"; (3) his argument that in order to reject the testimony of certain prosecutor's witnesses, the jury would be required to find that they intentionally perjured themselves; and (4) in discussing defendants' flight from the scene, his characterization of them as running and hiding "like creatures of the night". Considered in the light of the defense summations, and particularly in connection with the manner in which the Trial Judge responded to defendants' objections, we conclude that the prosecutor's summation did not deprive defendants of a fair trial. Since there was no real issue concerning the identity of the Milletts' assailants, much of the defense summations consisted of attacking the credibility of various prosecution witnesses and their versions of who provoked whom and the degree of force used by defendants. For example, it was argued by the defense that one witness "could not have seen what he said he saw". In responding to these tactics, it was not improper per se for the prosecutor to point out that defendants' argument carried with it the implication that the witnesses intentionally committed perjury. It was also not improper for the prosecutor to

allude to the flight of defendant Francis McCloskey, in attacking the credibility of his testimony; in no way can the prosecutor's remarks be interpreted to signify that .by fleeing and not coming to the aid of the victim, defendant Francis McCloskey was thereby rendered criminally responsible for the conduct of his brother. Unquestionably, in comparing defendants to "creatures of the night" and invoking the higher law of the Ten Commandments, the District Attorney may well have exceeded the proper bounds of prosecutorial advocacy. With respect to those comments, however, the trial court promptly sustained defendants' objections, admonished counsel, and instructed the jury to disregard them. The court in its general charge made a point of stressing that the jury was to decide the case solely on the basis of the evidence and that summations by counsel were not evidence. The court also charged that the jury was not to be swayed by appeals to sympathy or prejudice and significantly, repeated this portion of the charge when the jury returned for further instructions. The jury was also clearly and properly charged that defendant Francis McCloskey could not be convicted unless he had actually participated in the assault, and it was repeatedly instructed that the Grand Jury's indictment had no probative value whatsoever. We are fully satisfied that to whatever extent the prosecutor's summation may have been potentially prejudicial, any such effect was entirely dissipated by the trial court's rulings and instructions (*People v Galloway,* 54 NY2d 396, 399; *People v Arce,* 42 NY2d 179, 190; *People v Kuss,* 81 AD2d 427, 431). We likewise conclude that the verdicts against defendants were untainted by any alleged juror misconduct. Following the trial, a news account of an interview with the foreman of the jury disclosed that earlier a neighbor of his had made a derogatory remark about defendants and that this had been repeated to another juror who had been the sole holdout for acquittal of defendant Francis McCloskey. The testimony at the posttrial hearing established, however, that the remark consisted of describing defendants as "hairbags" which, while certainly unflattering, was not suggestive of any misconduct, let alone guilt, on their part. Moreover, according to the foreman and the juror to whom the remark was made, the incident came after the jury had completed deliberation on the homicide charges by voting unanimously to convict both defendants of manslaughter. Therefore, the evidence at the hearing fully supports County Court's finding that the misconduct, if any, did not in any way affect the verdicts (see *People v Belknap,* 57 AD2d 970, 971). Finally, given the seriousness of the offense and the manner in which it was committed by defendant Jerome McCloskey, it was well within County Court's discretion to deny him youthful offender treatment and to impose a sentence of from 6 to 18 years upon his conviction for manslaughter in the first degree. Judgments affirmed. Mahoney, P. J., Sweeney, Main, Casey and Levine, JJ., concur.