THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DAWN
MARIA CRUICKSHANK, Appellant.

Third Department, January 17, 1985

**APPEARANCES OF COUNSEL**

*McMahon & McMahon (John L. McMahon* of counsel), for appellant.

*David A. Wait, District Attorney,* for respondent.

**OPINION OF THE COURT**

MAHONEY, P. J.

This case involves the fatal shooting of G. Alan Cruickshank by his teen-age daughter during the early evening hours of November 15, 1982 in the garage of the Cruickshank residence located in the Town of Clifton Park, Saratoga County. At the time of the shooting, Mr. Cruickshank had been separated from his wife for about two years. Mrs. Cruickshank was living at the

residence with her and Mr. Cruickshank's two daughters, defendant, then age 17, and Teresa, then age 15. Pursuant to a separation agreement, Mr. Cruickshank could not enter the house itself, but was allowed visitation in the garage of the home on Monday nights from 7:00 P.M. to 8:00 P.M.

On the evening of Monday, November 15, 1982, defendant was at home alone since her sister was away at school and her mother was away on an errand. Around 7:00 P.M., Mr. Cruickshank telephoned the residence and informed defendant that he would be over shortly. He arrived soon after 7:00 P.M. and met defendant in the garage, a large, unheated, three-car structure with doors leading to the basement of the house as well as the interior of the house itself. According to defendant, an argument promptly ensued. Defendant testified that Mr. Cruickshank said that he was going to go into the basement because he was cold. The door to the basement had apparently been left open to allow some heat into the garage. Defendant testified that she did not want her father to go into the basement and that she told him he was not supposed to do so. Defendant testified that Mr. Cruickshank responded by grabbing her. Defendant pulled away and ran back into the house. She then took a .22 caliber rifle from under her bed, loaded it and returned to the garage. Defendant testified that, upon returning to the garage, she saw that her father was still there and was walking toward the open door to the basement. She testified that she aimed the rifle in his direction and pulled the trigger. She did not remember how many times she fired, but proof introduced at trial established that the rifle was fired 11 times and that 9 bullets struck the victim in the back and head, the first shot killing him almost immediately. Defendant then set down the rifle, went back into the house and called the Saratoga County Sheriff's Department to report the incident. The call came in at 7:14 P.M. according to records of the Sheriff's Department. Police officers who first arrived at the scene described defendant's condition as hysterical. This is confirmed by a taped recording of defendant's call to the Sheriff's Department.

Defendant was indicted and charged with second degree murder. Prior to trial, the court ordered defendant, if she intended to introduce psychiatric evidence, to serve on the People a notice of intent to proffer psychiatric evidence. Defendant did so, and the trial court ordered her to submit to a psychiatric examination. The trial court also ordered defendant to produce for discovery records of all psychiatric evaluations of her made subsequent to the night of the shooting, including any materials relating to hypnotic examinations of defendant.

At trial, defendant testified to numerous incidents of sexual abuse by her father over a period of years prior to the shooting. After indictment, but before trial, defendant underwent treatment with sodium amytal[1] to revive her memory of the incidents of sexual assaults by her father. The incidents related by defendant under the influence of sodium amytal and later at trial had not previously been reported by her to anyone, including the Grand Jury. However, defendant did disclose to the Grand Jury one incident of sexual abuse which had occurred a number of years prior to the shooting. Additionally, a police investigator stated that he spoke to defendant soon after the shooting and that statements she made led him to believe that defendant's mother had caught Mr. Cruickshank in bed with defendant. Defendant testified that she feared her father would sexually abuse her on the night of the shooting. There was also testimony given concerning turmoil in the Cruickshank home during the marriage, including acts of violence by Mr. Cruickshank.

The trial court charged the jury regarding murder in the second degree, the defense of justification to prevent a rape and the affirmative defense of extreme emotional disturbance which, if established, would reduce second degree murder to first degree manslaughter. The jury found defendant guilty of first degree manslaughter. The trial court denied defendant's request to be adjudicated a youthful offender and sentenced her to an indeterminate term of imprisonment of two and one-third to seven years. Defendant has taken this appeal from the judgment of conviction and was released on bail pending the appeal.

The initial issues to be resolved deal with several of the trial court's pretrial rulings regarding potential psychiatric evidence to be offered by defendant. Defendant contends that the trial court erred in requiring her to serve notice of intent to present psychiatric evidence and to submit to a psychiatric examination prior to trial. Pursuant to CPL 250.10 (subd 2), psychiatric evidence is not admissible at trial unless the defendant serves written notice of his intention to present psychiatric evidence. "Psychiatric evidence" includes evidence of "mental disease or defect" to be offered by the defendant in connection with (a) the defense of lack of criminal responsibility by reason of mental disease or defect, (b) the affirmative defense of extreme emotional disturbance, or (c) any other defense (CPL 250.10, subd 1). The trial court ordered notice in this case since, at pretrial proceedings, it became apparent that defendant might pursue

---

1. Sodium amytal, a barbiturate, is a hypnotic drug which can be used to reduce the amount of conscious activity in the brain of the patient so as to reduce the possibility of unconscious suppression of the memory.

the affirmative defense of extreme emotional disturbance (Penal Law, § 125.25, subd 1, par [a]) and/or the defense of justification (Penal Law, art 35), and that psychiatric testimony might be used to support such positions. Defendant contends that such order was erroneous because CPL 250.10 applies only where the defense or affirmative defense is based upon mental disease or defect as that term was used in section 30.05 of the Penal Law.[2] Here, defendant never indicated that she would claim such mental disease or defect and never attempted to offer proof in support thereof.

■ Defendant's contention must be rejected. By amending CPL 250.10 in 1982 (L 1982, ch 558), the Legislature expanded the notice requirement beyond those situations where psychiatric testimony might be used in support of the traditional insanity defense to include situations where it might be used in support of the affirmative defense of extreme emotional disturbance as well as other defenses (see Bellacosa, Practice Commentary, McKinney's Cons Laws of NY, Book 11A, CPL 250.10, p 425). Thus, the phrase "mental disease or defect" in CPL 250.10 (subd 1, pars [a], [b]) should be given a more expansive reading than that provided in section 30.05 of the Penal Law. Such a reading would be consistent with the purpose of the affirmative defense of extreme emotional disturbance which permits a defendant "to show that his actions were caused by a mental infirmity not arising to the level of insanity, and that he is less culpable for having committed them" (*People v Patterson,* 39 NY2d 288, 302, affd 432 US 197). Therefore, the trial court properly ordered defendant to submit a CPL 250.10 notice.

■ The trial court also properly ordered defendant to submit to a psychiatric examination pursuant to CPL 250.10 (subd 3). A defendant who raises an insanity defense is deemed to have waived the privilege against self incrimination and may be compelled to submit to a psychiatric examination (*Matter of Lee v County Ct.,* 27 NY2d 432, 441-442, cert den 404 US 823).

---

2. Section 30.05 of the Penal Law stated, in pertinent part:
"1. A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or defect, he lacks substantial capacity to know or appreciate either:
"(a) The nature and consequence of such conduct; or
"(b) That such conduct was wrong."
Section 30.05 of the Penal Law was repealed by chapter 668 of the Laws of 1984 and was replaced by section 40.15 of the Penal Law. The chapter was effective November 1, 1984, but was made inapplicable by section 9 of the chapter to criminal proceedings relating to an offense committed prior to such date.

Defendant's contention that, since she did not raise an insanity defense, she could not be compelled to submit to a psychiatric examination must be rejected. In *People v Segal* (54 NY2d 58), the Court of Appeals held that a psychiatric examination may be required where the defendant intended to offer psychiatric testimony regarding an alleged memory defect relevant in that case to the issue of intent, which defect did not rise to the level of insanity. It is true that in both *Lee* and *Segal* mental capacity was raised regarding an issue on which the People had the burden of proof beyond a reasonable doubt (*Lee* involved the defense of insanity[3] and *Segal* involved the intent element of the crime charged) such that it was unfair for the defendant to raise the issue of his mental capacity and then hide behind his privilege against self incrimination, thereby making the People's burden of proof virtually insurmountable (see *People v Segal, supra,* p 65). In our view, this reasoning is equally applicable where, as here, mental capacity relates to an affirmative defense, the burden of proof of which is on defendant. The People still have the right to attempt to rebut proof on the issue and, for that reason, this situation comes within the rationale of *Lee* and *Segal*.

Defendant argues that her privilege against self incrimination and her attorney-client and physician-patient privileges were violated when she was ordered to produce for discovery records of all psychiatric evaluations performed subsequent to the shooting, including those relating to treatments with sodium amytal. The People are entitled to discovery, on a nonreciprocal basis, of: "any written report or document * * * concerning a physical or mental examination * * * made by or at the request or direction of, the defendant, if the defendant intends to introduce such report or document at trial, or if the defendant has filed a notice of intent to proffer psychiatric evidence and such report or document relates thereto, or if such report or document was made by a person, other than defendant, whom defendant intends to call as a witness at trial" (CPL 240.30, subd 1, par [a]).

As discussed earlier, once it became apparent that defendant intended to pursue the affirmative defense of extreme emotional disturbance and/or the defense of justification, and might offer psychiatric testimony in support thereof, it was proper for the trial court to order her to file a notice pursuant to CPL 250.10 (subd 2) and to submit to a psychiatric examination. Thus,

---

**3.** The effect of chapter 668 of the Laws of 1984 is to change lack of criminal responsibility from a defense to an affirmative defense.

pursuant to CPL 240.30 (subd 1, par [a]), the People were entitled to discovery of written reports concerning mental examinations which related to the defense and the affirmative defense. In our view, the materials which the trial court ordered defendant to produce, including records of psychiatric evaluations of defendant subsequent to the night of the shooting and all materials relating to hypnotic procedures conducted upon defendant, were sufficiently related to the proposed defense and affirmative defense so as to fall within the statute; thus, they were properly ordered produced. Finally, the discovery order did not violate defendant's privilege against self incrimination or her attorney-client and physician-patient privileges. As discussed above, when it became apparent that defendant would offer psychiatric evidence in support of the defense of justification and/or the affirmative defense of extreme emotional disturbance, she waived these privileges with respect to the psychiatric records and documents relating thereto (see *People v Edney*, 39 NY2d 620, 624-626; *People v Al-Kanani*, 33 NY2d 260, 264-265, cert den 417 US 916; *Matter of Lee v County Ct.*, 27 NY2d 432, *supra*).

Defendant contends that the trial court erred in ordering a hearing to determine the admissibility of defendant's pre- and post-sodium amytal recollections regarding sexual abuse by her father (see *People v Hughes*, 59 NY2d 523). We need not consider this question since, after the hearing, the trial court ruled that defendant could testify at trial without restraint. Thus, defendant was not prejudiced by the decision to hold a *Hughes* hearing.

Defendant alleges that the trial court erred in precluding expert testimony regarding the rape trauma syndrome which would explain her reluctance to discuss, prior to treatment with sodium amytal, the incidents of sexual abuse by her father. However, it is apparent that the trial court did not preclude such evidence, but simply restricted the point in the trial when it could be introduced. To have allowed expert testimony on the rape trauma syndrome immediately after defendant testified on her direct examination about the incidents of sexual abuse would have been to permit improper bolstering testimony (see *People v Ciaccio*, 47 NY2d 431, 439). It is within the sole province of the jury to pass on credibility and, where the purpose of the expert witness is to bolster the testimony of another witness by explaining that his or her version of the facts is believable, such expert testimony is improper (*id.*). Under similar analysis, the trial court properly ruled that, should the People raise the issue of the discrepancy between defendant's

pre- and post-sodium amytal recollection during cross-examination or otherwise, defendant could introduce evidence on the rape trauma syndrome. In this situation, the evidence would not be introduced to bolster defendant's testimony, but to explain her initial reluctance to recount the instances of sexual abuse in response to the People's attack on her credibility. Thus, it is clear that the trial court's ruling on when evidence of the rape trauma syndrome could be introduced was correct.

■ Defendant challenges the trial court's refusal to charge, in addition to justification to prevent a rape (Penal Law, § 35.15, subd 2, par [b]), justification in defense of premises. Subdivision 3 of section 35.20 of the Penal Law provides: "A person in possession or control of, or licensed or privileged to be in, a dwelling or an occupied building, who reasonably believes that another person is committing or attempting to commit a burglary of such dwelling or building, may use deadly physical force upon such other person when he reasonably believes such to be necessary to prevent or terminate the commission or attempted commission of such burglary."

A burglary may be defined as a knowing and unlawful entry into a building or dwelling with intent to commit a crime therein (Penal Law, §§ 140.20, 140.25, 140.30). Defendant argues that there was sufficient evidence for the jury to have concluded that she reasonably believed that Mr. Cruickshank intended to enter the home with intent to commit a crime therein, i.e., rape or sexual abuse (Penal Law, art 130), incest (Penal Law, § 255.25), assault (Penal Law, art 120), or destruction of property (criminal mischief [Penal Law, art 145]). In our view, no reasonable view of the evidence would support a reasonable belief on the part of defendant that her father intended to enter the house that evening to commit a crime. Therefore, the trial court's refusal to so charge was proper (*People v Watts*, 57 NY2d 299, 301).

Defendant herself testified that her father told her that he was going to go into the basement because he was cold. The evidence in the record regarding previous acts of violence and property destruction by Mr. Cruickshank relates to incidents remote in time to the night of the shooting. There is no evidence that Mr. Cruickshank improperly entered the house or engaged in any acts of violence therein during the one and one-half years prior to the shooting when he was not allowed in the house. Moreover, all of the alleged incidents of sexual abuse which occurred after Mr. Cruickshank left the house took place, not in the house, but at an apartment complex owned by Mr. Cruickshank. The only incident of sexual abuse which was alleged to

have taken place in the house occurred a number of years prior to the night of the shooting. It is apparent that the allegations of criminal activity on the part of defendant's father which occurred in the house were too remote in time to support a reasonable belief that he intended to enter the house and commit a crime therein on the night in question. Additionally, since the allegations of rape, sexual abuse and incest which occurred more recent to the night of the shooting uniformly occurred at a location other than the house, they do not support a reasonable belief that Mr. Cruickshank intended to enter the house and commit those crimes on the night of the shooting. Finally, we note that the trial court did give a charge on justification to prevent a rape. Pursuant to that charge, the jury could have found justification if it found that defendant reasonably believed that her father was committing or attempting to commit a forcible rape against her on the evening in question, without regard to the place of the attack (Penal Law, § 35.15, subd 2, par [b]).

We now turn to defendant's contention that the trial court erred in denying her request to be adjudicated a youthful offender.[4] Whether to grant youthful offender treatment lies within the sound discretion of the sentencing court (CPL 720.20, subd 1; *People v Bruce,* 57 AD2d 1024). The statute permits a finding of youthful offender status if "the interest of justice would be served by relieving the eligible youth from the onus of a criminal record and by not imposing an indeterminate term of imprisonment of more than four years" (CPL 720.20, subd 1, par [a]). The purpose of according youthful offender treatment is to avoid "stigmatiz[ing] youths between the ages of 16 and 19 with criminal records triggered by hasty or thoughtless acts which, although crimes, may not have been the serious deeds of hardened criminals" (*People v Drayton,* 39 NY2d 580, 584). Youthful offender status "permits the court to mete out fair punishment for a young adult's crimes and transgressions yet mitigates future consequences in recognition of, *inter alia,* the youth's lack

---

4. The dissent contends that defendant is not eligible for youthful offender treatment because she was convicted of an armed felony and there do not exist mitigating circumstances that bear directly upon the manner in which the crime was committed (see CPL 720.10, subd 3). It must be noted that the trial court expressly found that defendant was eligible for youthful offender treatment and the People do not take issue with this finding on appeal. Moreover, the jury's finding that defendant acted under the influence of extreme emotional disturbance is not the sole mitigating circumstance involved here. Rather, there is a great deal of evidence in the record of the trial and the presentence hearing dealing directly with the circumstances out of which the crime arose.

of experience and the court's hope for his future constructive life" (*People v Gordon S.*, 89 AD2d 912, 913). While the statute does not set forth any specific criteria to be considered upon an application for youthful offender status, a review of pertinent case law indicates that the factors to be considered include the gravity of the crime and manner in which it was committed, mitigating circumstances, defendant's prior criminal record, prior acts of violence, recommendations in the presentence reports, defendant's reputation, the level of cooperation with authorities, defendant's attitude toward society and respect for the law, and the prospects for rehabilitation and hope for a future constructive life (see *People v McCloskey*, 92 AD2d 672, 674; *People v Johnson*, 92 AD2d 672; *People v Gordon S., supra; People v Glen W.*, 89 AD2d 883; *People v Williams*, 78 AD2d 642; *People v Richard H.*, 65 AD2d 775; *People v Andrews*, 65 AD2d 688; *People v Bruce, supra; People v Gower*, 45 AD2d 188, 191; *People v Kerr*, 43 AD2d 895).

Applying these criteria to the instant case, there is no question that defendant stands convicted of an extremely serious, violent crime for which the jury found no justification. However, defendant had no previous criminal record, nor does the record reveal any other past violent or antisocial conduct on her part. She has a reputation as an industrious, honest student who has respect for law and authority, and evidence introduced prior to sentencing indicates that she is remorseful about the shooting. She cooperated fully with the authorities from the instant she set down the rifle on the night of the shooting. Moreover, it is apparent from defendant's conduct since the shooting that, with the proper counseling and guidance, her prospects for rehabilitation and a future constructive life are very good. Additionally, after a thorough investigation and analysis, the Probation Department recommended in its presentence report that defendant be treated as a youthful offender.

In combination with the above-discussed factors are the significant mitigating circumstances that defendant is a sexually abused child and that the crime of which she was convicted arose out of that fact. In addition to her own testimony regarding incidents of sexual abuse by her father, defendant offered uncontradicted expert psychiatric testimony at the trial, the *Hughes* hearing and the sentencing hearing that defendant's conduct and symptoms, including her initial reluctance to fully reveal the details of the sexual abuse, were classic characteristics of a sexually abused child and of the rape trauma syndrome. These experts, while admitting that it is theoretically possible for an individual in defendant's position to fabricate such a story, were

of the opinion, based on their expertise and interviews with defendant, that she had not contrived the story. This position is supported by statements made by defendant to police officers immediately after the shooting, made before any doctors or lawyers entered the proceedings, which imply that she had been sexually abused by her father. Since the jury found that defendant had proved that she acted "under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse" (Penal Law, § 125.25, subd 1, par [a]), and the only proof offered in support of that affirmative defense was the sexual abuse of defendant, the jury also must have believed the testimony on this issue. These mitigating circumstances establish that defendant's act was not the cold and calculating product of a criminal mind, but the result of emotional trauma brought about through no fault of her own (see *People v Drayton, supra*).

All of the criteria discussed above militate in defendant's favor except the serious nature of the crime of which she was convicted. While this is an important factor, the Legislature, by making youthful offender treatment available for a conviction of first degree manslaughter, has determined that this factor alone does not mandate denial of such treatment. Additionally, contrary to the position taken by the People, the fact that the jury has already afforded defendant the mitigating circumstance of extreme emotional disturbance does not weigh against youthful offender treatment. The determination of youthful offender treatment must be made based on the crime of which the individual was convicted, not the crime of which he or she was indicted (see *People v Drummond,* 40 NY2d 990, 992, cert den *sub nom. New York v Luis J.,* 431 US 908). Moreover, the jury's finding of extreme emotional disturbance did not constitute an exercise of discretion or mercy, but a factual finding that defendant proved the affirmative defense by a preponderance of the evidence.

In sum, weighing all the appropriate factors, while we do not necessarily feel that the trial court abused its discretion in denying youthful offender treatment, we choose to exercise our discretion (CPL 470.15; see *People v Wayman,* 106 AD2d 758; *People v Glen W., supra; People v Richard H., supra*) by vacating the conviction and adjudicating defendant a youthful offender. Further, it is apparent that the traditional purposes for sentencing (see *People v Golden,* 41 AD2d 242, 244) would not be served by sentencing this defendant to an indeterminate term of imprisonment.[5] Indeed, testimony at the presentence hearing, in-

5. We note in particular that, inasmuch as defendant was found to have

cluding that of an official in charge of placing adolescent offenders, indicated that a prison sentence for this defendant would not only be counterproductive, but would be physically and emotionally dangerous to her as well. Therefore, we remit this matter to the trial court to fix a reasonable definite term of incarceration along with a probationary period which includes the necessary counseling.

In light of our adjudication of defendant as a youthful offender, we need not address her claim that the indeterminate sentence imposed is harsh and excessive.

We have considered the remaining contentions advanced by defendant and find them without merit.

KANE, J. (dissenting). I would affirm the judgment of conviction. Adjudicating this defendant a youthful offender under the circumstances presented is neither appropriate nor do I believe it to be within the contemplation of the statutory framework providing for such a procedure.

Defendant was tried under an indictment charging her with murder in the second degree. She was convicted of manslaughter in the first degree. The trial court in its charge instructed the jury with regard to the defense of justification, or as the court described it, that which "in layman's terms is known as the defense of self-defense". Had the People failed to disprove this defense beyond a reasonable doubt, the verdict would have been not guilty. Therefore, the jury must have determined that defendant was not justified in using deadly physical force in the defense of her person (see Penal Law, § 35.15, subd 2, par [b]).

The trial court also instructed the jury that in a prosecution for murder in the second degree, it is an affirmative defense to be established by defendant by a fair preponderance of the evidence that at the time of the commission of the crime she was acting under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in defendant's situation under the circumstances or as defendant believed them to be (Penal Law, § 125.25, subd 1, par [a]). The trial court further instructed the jury that if this defense was established and defendant found guilty of murder in the second degree beyond a reasonable doubt, they must return a verdict of guilty of manslaughter in the first degree instead of guilty of murder in the second degree. This is, of course, a correct

---

acted under extreme emotional disturbance, the deterrent effect of a harsh sentence is questionable.

statement of the law for the Legislature has specifically provided that "[t]he fact that homicide was committed under the influence of extreme emotional disturbance constitutes a *mitigating circumstance* reducing murder to manslaughter in the first degree" (Penal Law, § 125.20, subd 2 [emphasis added]; see, also, *People v Casassa,* 49 NY2d 668, 680, cert den 449 US 842; 1 Callaghan, Law in New York [3d ed], § 18:18, pp 31-34).

The youthful offender procedure is set forth in CPL article 720. Although otherwise qualified, defendant, having been convicted of an armed felony, would not be eligible for treatment as a youthful offender unless she fell within an exception contained in CPL 720.10 (subd 3), which, in applicable part, provides: "Notwithstanding the provisions of subdivision two, a youth who has been convicted of an armed felony offense is an eligible youth if the court determines that one or more of the following factors exists: (i) mitigating circumstances that bear directly upon the manner in which the crime was committed".

The majority, in exercising its discretion in the interest of justice, finds mitigating circumstances to defendant's conviction for the crime of manslaughter in the first degree flowing from the fact that the jury found that defendant acted under the influence of extreme emotional disturbance. These are the same circumstances which converted a verdict of guilty of murder in the second degree to manslaughter in the first degree in accord with the statutory mandate and thus diminished defendant's culpability and alleviated her guilt (*People v Casassa, supra,* pp 675-681). I cannot accept the conclusion that it was the intent of the Legislature that these same mitigating circumstances bear on the *manner* in which the crime was committed and thus can be used to vacate the conviction and substitute for it an adjudication that defendant is a youthful offender (see *People v O'Neill,* 86 AD2d 213).

Finally, although the majority does "not necessarily feel that the trial court abused its discretion in denying youthful offender treatment" and exercises its own discretion in the interest of justice, they are, in practical effect, saying that there was an abuse of discretion. I cannot subscribe to such a conclusion (see *People v McCloskey,* 92 AD2d 672; *People v Robinson,* 65 AD2d 803). The trial court was directly involved with all phases of this prosecution, thoroughly familiar with all the facts and circumstances, and was present to evaluate all the testimony at trial and at the sentencing hearing. The trial court delineated all the reasons for sentencing as it did, and I am unable to find that its discretion was abused. The court considered, among other

things, the expert testimony of psychiatrists and a psychologist in arriving at its decision. The court was also aware that recommended psychiatric counseling of defendant's own choice would be available to her upon incarceration. Simply stated, this record does not demonstrate an abuse of discretion. In the absence of such abuse, this court should not exercise its discretion to arrive at a contrary result (CPL 720.20; *People v McCloskey, supra; People v Robinson, supra;* see, also, *People v Bruce,* 57 AD2d 1024).

CASEY, LEVINE and HARVEY, JJ., concur with MAHONEY, P. J.; KANE, J., dissents and votes to affirm in an opinion.

Judgment reversed, as a matter of discretion in the interest of justice; conviction vacated, and defendant declared to be a youthful offender; and matter remitted to the County Court of Saratoga County for resentencing.