THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v EDGAR R. BAGAROZY, Appellant.

First Department, December 15, 1987

APPEARANCES OF COUNSEL

*David K. Bertan* of counsel *(Peter D. Coddington* with him on the brief; *Mario Merola, District Attorney,* attorney), for respondent.

*Steven Wasserman* of counsel *(Philip L. Weinstein,* attorney), for appellant.

### OPINION OF THE COURT

SULLIVAN, J. P.

Charged with engaging in four acts of oral sodomy with

three youths, Dennis M., Manuel (Manny) O. and Angel J., defendant was convicted by a jury of two counts of sodomy in the second degree (Penal Law § 130.45),* for which he was sentenced to consecutive terms of imprisonment of from 3½ to 7 years. The proof of each crime was provided by the particular victim, who, being under the age of legal consent, testified that he had permitted the 37-year-old defendant to place his mouth on the victim's penis in exchange for being taken to the movies or to an amusement park.

The charges involving Dennis were dismissed after an in-court recantation. He attributed his false accusation to police threats to incarcerate him and expose his own homosexuality. In his testimony, Manny, Dennis's friend, repudiated a similar recantation, which had been broadcast on television, attributing his previous recantation to anger at the police. He testified to two uncorroborated incidents. The charges relating to the first incident were dismissed for lack of corroboration as required by Penal Law § 130.16 prior to its amendment. Defendant was convicted of the charge involved in the second incident, despite Manny's confusion as to whether it had occurred before or after November 1, 1984, the effective date of the amendment of Penal Law § 130.16, which now no longer requires corroboration in underage cases. Defendant was also convicted of the charges relating to an incident described by Angel.

██ Defendant, who would have been exposed to questioning about one of his two prior sodomy convictions by virtue of the court's *Sandoval* ruling, chose not to testify. The prosecutor nevertheless made his sexual orientation the central focus of the trial, as she filled the record with evidence of defendant's propensity to engage in sexual activity with young boys. She introduced evidence that he was affiliated with the newsletter of the North American Man-Boy Love Association (NAMBLA), an organization that advocates sexual activity between adults and boys, as proof of his "intent" to commit sodomy, that he had been previously known to the police as a pedophile, and that he had raised a constitutional challenge in Federal court to the statute under which he was being prosecuted. Her summation concluded with the stinging rebuke that defendant had joined with NAMBLA to "stop the little

---

* Penal Law § 130.45 provides, "A person is guilty of sodomy in the second degree when, being eighteen years old or more, he engages in deviate sexual intercourse with another person less than fourteen years old."

children from coming to Jesus." Since we are unable to ascertain any justification for these trial tactics and find that defendant was denied his basic right to a fair trial, we reverse the conviction and remand for a new trial.

The trial testimony disclosed that several days after an initial introduction to defendant sometime in February of 1984, 13-year-old Manny found himself alone with defendant in the latter's apartment, where they watched movies on the VCR. Later, as they watched television in the bedroom, defendant began "playing with" Manny, touching his hair, and "patting" his head. After defendant promised to take him to Action Park, Manny allowed defendant to place his mouth on Manny's penis.

In November of 1984, approximately one week before Thanksgiving, Manny was again present in defendant's apartment with defendant and another youth named Luis. Defendant told Manny that he would take him to the movies if Manny would engage in oral sex with him. Manny agreed and defendant took him to the bedroom, where he placed his mouth on Manny's penis. Afterwards, defendant took Manny and Luis to the movies.

On or about the 8th or 10th of January 1985, Angel, 11 years of age, accompanied by Luis and a boy named Tony, visited defendant's apartment. Luis and Tony went into the bedroom while Angel watched television. Sometime later, Angel entered the bedroom, where he observed Tony and Luis with their pants down. Defendant, who was also in the bedroom, pulled Angel's pants down, put him on the bed, and then placed his mouth on Angel's penis. After Angel returned to the living room, defendant remained in the bedroom with Luis and Tony.

Shortly after his arrest on January 15, 1987, defendant telephoned Manny from Rikers Island to tell him that he did not want him to say anything to the police about the incidents in his apartment. Approximately two weeks before the trial, defendant again telephoned Manny, who was staying in Florida, and told him that if he did not come to New York, defendant would "be alright", and the charges would be dismissed.

Both Tony and Luis, each of whom was 14 at the time of trial, testified on defendant's behalf. Tony, who had known defendant for approximately two years, denied ever having any sexual contact with defendant, or ever taking his pants off

or having had his pants taken off in defendant's presence. Nor did he ever see Angel take his pants off in defendant's presence.

Luis testified that he visited defendant's apartment on approximately nine occasions, on several of which he met other men. Defendant never touched him in "a sexual way", nor asked to touch him. Not only did he not engage in sex with defendant, but he never saw Angel "do anything" of a sexual nature in defendant's presence. Sometime after defendant's arrest, he testified before the Grand Jury and told the jurors that he never engaged in sexual activity with defendant.

To appreciate fully the extent of the prosecutor's preoccupation with defendant's sexual propensities, a brief overview of her trial tactics is in order. Immediately before the trial was to commence, she sought leave to introduce, on the People's case, defendant's two prior 1983 convictions of sodomy in the second degree. The prosecutor argued that since both convictions and the present charges involved acts of oral sex with underage Hispanic youths, all of which took place in defendant's bedroom, the convictions were direct proof of his intent and a common plan or scheme with respect to the present charges. The trial court denied the application "at this point", but added, "It may well be at the close of the case and before you rest that you might want to repeat that application." Concerned about inadvertently opening the door to the convictions, defendant's attorney sought guidelines, which the court declined to set. Instead, it reiterated that the convictions "may very well become relevant at a later point."

The court also declined to rule on defendant's motion, *in limine,* seeking to exclude literature, photographs and films taken from his apartment pursuant to a search warrant executed after his arrest. The literature consisted of NAMBLA newsletters, to which defendant was a contributor. According to the prosecutor, the materials, which, *inter alia,* included an erotic poem entitled "The Coupling" about a man performing oral sodomy on a boy, might prove to be admissible on the issue of intent. The court deferred its rulings on the material, and directed the prosecutor to apply for advance rulings.

Defendant's opening statement acknowledged that the evidence would show that he was a homosexual who has friendships, but "not wrong friendships", with young men. The

police, however, on the basis of an anonymous complaint received during a period of highly publicized child abuse cases in The Bronx, had begun a surveillance of him. He argued that the evidence would show that the police, perceiving his homosexuality, and fearing the worst about his friendships, sought to confirm their suspicions through aggressive interrogation of supposed victims. With threats of incarceration and other pressure tactics, the police eventually succeeded in inducing false accusations against him.

Nine days later, and just before Sergeant Maginnis of the Public Morals Division of the New York City Police Department, who had investigated the complaint against defendant and eventually arrested him, was to testify, the prosecutor renewed her pretrial application for leave to introduce evidence of defendant's background. Citing a remark in defendant's opening statement that the police had been surveilling him because of his homosexuality, the prosecutor sought to elicit the true basis of their suspicions, viz., that defendant, based upon his sodomy convictions and his affiliation with NAMBLA, was "a known pedophile". Noting that the remark "suggest[ed] to this jury that the investigation was based on the homosexual character of the defendant rather than any other purpose", the court ruled that the People should be permitted to show the background of the police investigation, but it adhered to its initial ruling excluding any reference on their case to defendant's criminal background. As to the police investigation, the court ruled that Sergeant Maginnis could testify, without going into its content, that he received a telephone call which led an investigation that eventually focused on defendant, who, according to his information, was believed to be a pedophile.

During the examination of Sergeant Maginnis, after the prosecutor had elicited that he began a surveillance on the basis of a telephone complaint and two interviews with one of the young boys, the following transpired:

"Q: Did you receive any information through the police department morals division files about the defendant that also led to your focusing in on him and your surveillance of his home?

"A: Yes.

"[Defendant's attorney]: Objection to the form of the question.

"THE COURT: I'll permit the question.

"Q: And what was that information?

"A: The subject was known to the police department morals division.

"Q: In what way?

"[Defendant's attorney]: Objection to the form and response.

"THE COURT: * * * you may lead him with a yes or no answer at this time.

"Q: Was the defendant a known pedophile—

"[Defendant's attorney]: Objection—

"THE COURT: Objection sustained."

The court chastised the prosecutor for her use of the characterization of defendant as a "known" pedophile, reserved decision on defendant's motion for a mistrial and cautioned the jury to disregard the question entirely.

As already noted, Dennis, a People's witness, recanted. After a long and fruitless effort to impeach his denial that he had ever had sexual contact with defendant, the prosecutor conceded that she could not establish the sodomy and sexual abuse charges. In an effort, however, to prove a remaining misdemeanor charge of endangering the welfare of a child, she sought to question Dennis about his exposure to the literature and photographs recovered from defendant's apartment, even though this theory of endangerment was never raised in either the indictment or the People's bill of particulars, and defendant was never charged with disseminating indecent materials to minors (see, Penal Law § 235.21). The prosecutor was permitted, over objection, to question Dennis about the erotic films and photographs found in the apartment, all of which Dennis said he had never seen. It should also be noted that when the court, in preparing its charge, inquired as to the factual basis for the child endangerment charge, the prosecutor replied: "Well, the sodomy itself and the surrounding circumstances."

On cross-examination, defendant elicited from Dennis that he and his mother were participants in a Federal lawsuit against the police for harassment. On redirect examination, Dennis maintained that his suit against the police was for harassment, not for anything else, and that he and others were seeking $17,000,000 in damages. Although unsuccessful in her attempts to elicit that the legal papers for Dennis's suit had been drafted by an alleged NAMBLA associate of defendant, who was himself serving a sentence at Rahway State

Prison for sodomy, the prosecutor was permitted to show that defendant had twice taken Dennis and Manny to Rahway State Prison to be interviewed by an inmate. The court instructed the jury not to consider this evidence as indicative of defendant's guilt "in any way, shape, or form."

Handing Dennis a copy of the Federal court complaint, which Dennis had never seen, the prosecutor, over objection, asked whether he knew if "there was a motion made in federal Court to stop the prosecution of this defendant that's going on now, to put a stop to this?" The prosecutor was also permitted to ask whether defendant had ever told him "that he considered the sodomy statute that he was charged under to be unconstitutional." In response to an objection, the prosecutor noted that defendant had "opened the door to everything about [the law suit]." The court ruled that it "would permit [the prosecutor] to proceed in this fashion", and cautioned the jury that the ensuing questions related only to Dennis's credibility, not to defendant's guilt. The prosecutor proceeded to question Dennis as follows:

"Q: Do you know that [defendant is] charged with having had sex with youths under the age of 14, do you know that?

"A: Yes.

"Q: Now isn't it a fact that the reason that you and he brought the lawsuit is because he and you believe that youths under the age of 14 should have the right to have sex with an adult male; is that correct?

"A: No, not me.

"Q: Oh! What about him?

"[Defendant's attorney]: Objection.

"THE COURT: Sustained.

"Q: Were you joined in—well, you joined in that lawsuit, didn't you?

"A: Yes * * *

"Q: And isn't it a fact that all of the things that he finds wrong with this prosecution you agree with?

"[Defendant's attorney]: Objection.

"THE COURT: Objection sustained."

After concluding her redirect examination of Dennis, which had extended over four days, the prosecutor, to the court's surprise, moved to strike all the testimony concerning the Federal lawsuit, on the ground of its being "totally collateral anyway and * * * all hearsay." The prosecutor apparently

was vexed because the court, which, she claimed, had overruled her objection to defense counsel's initial question of Dennis as to whether he had a Federal lawsuit pending against the District Attorney and the Police Department, refused to permit her to bring out the fact that the lawsuit had been dismissed. Ultimately, the court, *sua sponte,* charged the jury to consider the Federal lawsuit only in determining how much weight to accord the testimony of those witnesses who joined that lawsuit and the effect, if any, it might have on their testimony.

During the course of Manny's examination he testified that he had, on one unspecified occasion, observed the December 1984 issue of NAMBLA's newsletter at defendant's bedside, that defendant had offered it to him to read, and had invited him to a NAMBLA meeting, which offers Manny declined. The court ruled that the newsletter was now admissible to show defendant's "intent at the time of the commission of the crime." As the newsletter was circulated among the jury, the court charged that it was not to be considered as evidence of defendant's life-style or beliefs, but only of his "intent at the time of the alleged incidents." In its concluding charge, the court added that "there has been no evidence that defendant's membership in NAMBLA is illegal."

Since Manny had stopped visiting defendant in November and could not have seen the December newsletter, according to defendant, the People called Detective Healy of the Police Department's Morals Division, who had infiltrated NAMBLA, to testify that the December newsletter had been printed in November. When it became apparent that Detective Healy's undercover activities had ended before that particular edition had gone to press, the court directed the prosecutor to limit her questioning of the witness to his "personal knowledge of the distribution of the NAMBLA bulletin and as to the period of time that he was associated with NAMBLA when it was distributed." The court also permitted the prosecutor to elicit that Healy knew defendant as Richard Boyer, a name which appears on the list of contributors to the newsletter. Despite these directions, the prosecutor provoked another motion for a mistrial by asking Detective Healy "And at the meetings that you attended where you saw the defendant, did any—did you observe any sexual acts or—?"

The court's restrictions were again flouted in the prosecutor's cross-examination of NAMBLA newsletter publisher Peter Meltzer, who had been called merely to establish that

the December issue was not printed until January. The court sustained objections to persistent questioning about the December newsletter's nude photographs, its article about police entrapment, and the poem, "The Coupling". The court also struck a question about the legality of selling the bulletin to minors.

Although the prosecutor began her summation with a disclaimer that defendant had been "charged with reading dirty magazines", the first evidence to which she referred was the NAMBLA newsletter. She urged the jury "to pay particular attention to a poem on page 9, called 'The Coupling' [which, if] read * * * in its entirety * * * will help to enlighten you as to what the defendant's intent is in this case * * * with regard to those children in his home." She argued: "Look at the pictures * * * They're little boys. Like all the little boys that testified at this trial" that defendant had taken the "kids in his apartment * * * to Rahway State's Prison and introduced them to an inmate there" and also, "If you want to know what the defendant wants of these kids * * * read these, that will tell you what he wants."

The prosecutor also noted: "The defendant * * * is an editor for the bulletin [who] subscribes to what is included in here and what is included in here indicate[s] his intent * * * to have sex with children under the age of consent, as far under as they can get the law to be, without any punishment. That's what they exist for, that's what they want. Is that what you want in this country?" Although sustaining an objection to this argument, the court allowed, over objection, the further argument that the youths in the case "are the future of the Bronx, the future of the state * * * Is their future going to be in NAMBLA?"

The summation concluded with this Biblical allusion:

"I'm reminded of the words of a man who once lived and told other men how to treat children. That man was called Jesus and he said:

" 'Let the little children come to me and do not stop them for it is—such as these, that the Kingdom of God belongs.' "

"Well, I submit to you that Richard Boyer Bagarozy, whatever his name is—he's trying to stop them.

"[Defendant's attorney]: I reserve a motion, your Honor. The purpose of this trial is to see that justice is done."

Defendant's motion for a mistrial was denied, and the jury, as

already noted, after deliberating overnight, convicted defendant of sodomizing Manny and Angel.

■ The issue at trial was whether defendant had engaged in several discrete acts of oral sodomy with underage youths, not the state of mind with which those acts were committed. Yet, by successfully arguing a variety of inapplicable and implausible theories of admissibility, the prosecutor was able to place before the jury a wealth of prejudicial information about defendant's deviate life-style and associations. As the prosecutor's summation graphically makes clear, the true purpose behind the introduction of this evidence was to expose defendant's sexual preferences and attitudes in order to demonstrate a propensity to commit the crimes charged. The use of this evidence for such a purpose was a clear violation of well-settled legal principles.

Evidence of uncharged crimes is inadmissible if such evidence is offered solely to show a criminal disposition and, therefore, that the defendant is likely to have committed the crime charged. *(People v Molineux,* 168 NY 264; *People v Goldstein,* 295 NY 61, 64; Richardson, Evidence § 170 [Prince 10th ed].) Evidence of other crimes is admissible, however, if directly probative of the crime charged. In such a case, the evidence is relevant for purposes other than to show a criminal disposition and its probative value is deemed to outweigh the danger of prejudice. *(People v McKinney,* 24 NY2d 180, 184; *People v Schwartzman,* 24 NY2d 241.) In *People v Molineux (supra,* 168 NY, at 293), the Court of Appeals, not intending to state the exceptions with categorical precision, held that proof of an uncharged crime is competent to prove the crime charged when it tends to establish motive, intent, the absence of mistake or accident, a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, and the identity of the person charged with the commission of the crime at issue.

In many cases, the requisite criminal intent is readily inferable from the act itself. Where, however, the nature of the act is equivocal and a particular intent cannot be inferred, extrinsic proof is admissible to negate the existence of an innocent state of mind. In such cases, evidence of other similar acts is permitted under the intent exception. *(Matter of Brandon,* 55 NY2d 206, 211; *People v McKinney, supra,* 24 NY2d, at 184; *People v Molineux, supra,* 168 NY, at 297-298; Richardson, Evidence § 172 [Prince 10th ed].) The rationale

underlying the admission of such proof is that "the successive repetition of similar unlawful acts tends to reduce the likelihood of the actor's innocent intent on the particular occasion in question." *(Matter of Brandon, supra,* 55 NY2d, at 212.) Thus, evidence of prior similar acts may be admitted to establish such crimes as receiving stolen property *(People v Marino,* 271 NY 317), feloniously uttering a forged instrument *(People v Dolan,* 186 NY 4; *People v Everhardt,* 104 NY 591), forgery *(People v Marrin,* 205 NY 275) and larceny by false pretenses *(People v Schwartzman,* 24 NY2d 241). In the trial of sex offenses, extrinsic evidence of intent is admissible only in those cases where there is no challenge to the occurrence of the physical contact itself, but the intent of the actor is at issue because the nature of the contact is subject to varying interpretations. *(See, e.g., People v Young,* 99 AD2d 373 [father's fondling of his infant daughter was equivocal]; *People v Sims,* 110 AD2d 214, *lv denied* 67 NY2d 657 [mother alleged accidental injury to child].)

In this case, the acts charged are not in the least equivocal. Defendant has consistently denied any sexual contact with his accusers and has never offered an innocent explanation as to those specific acts. Nor could he. Thus, his intent was never at issue. Nor was proof of the extraneous matters introduced at trial authorized under the "amorous design" exception to *Molineux (supra; see, People v Lewis,* 69 NY2d 321). In *Lewis,* the court noted that the necessity for proof of the mutual disposition of the parties in an incest case forms the basis for the "amorous design" exception, but where a crime does not require specific intent, only the general intention to perform the prohibited act, as is the case here, "amorous design" is irrelevant *(supra,* at 327).

As a review of this record makes clear, the court and the prosecutor mistakenly equated "intent" with "inclination" or "proclivity", subjects expressly proscribed by *Molineux (supra).* Defendant's affiliation with NAMBLA, as well as his dissemination of its ideas, is, without question, powerful evidence of his sexual tendencies and desires. That this was the function of the NAMBLA connection is clearly demonstrated by the prosecutor's persistent references in summation to what NAMBLA and defendant "want", as distinguished from what the evidence showed defendant to have done. The use of this evidence for that purpose was highly improper. *(See, People v Huth,* 92 AD2d 778.) The prosecutor's excessive reliance on the poem appearing in the NAMBLA newsletter, as well as

her improper reference to alleged sexual activity at the NAMBLA meetings, clearly demonstrates her efforts to elevate defendant's NAMBLA affiliation to proof of his misdeeds.

By seizing on defendant's trial strategy to acknowledge his homosexuality, the prosecutor was able to bring out his preference for youths, and, additionally, that this preference had earned him a place in the police records of known pedophiles. The references to defendant's pedophilia were improper and the result of an erroneous ruling, since it would have been sufficient to meet the claim of homosexual bias to demonstrate that a civilian complaint had led to an investigation which ultimately focused on defendant. While the opposing party is permitted to explain or clarify what has been put in issue, "the trial court should normally 'exclude *all evidence which has not been made necessary by the opponent's case*' " *(People v Melendez,* 55 NY2d 445, 452, citing 6 Wigmore, Evidence § 1873, at 672 [Chadbourn rev ed] [emphasis in original]). That error was then compounded by a series of questions put to Sergeant Maginnis which disclosed that defendant was "known to the police department morals division" and that he was "a known pedophile." With that evidence before the jury, defendant was deprived of whatever chance he had for a fair trial, and his application for a mistrial should have been granted. The court's instruction, *sua sponte,* to overlook "what was known" about defendant could not possibly have eradicated this devastating and highly improper disclosure. *(See, People v Robinson,* 273 NY 438, 445-446.) Moreover, by eliciting that defendant had already earned a place in the Morals Division files as a known pedophile, the prosecutor indirectly flouted the court's repeated and clear ruling excluding defendant's police record for similar conduct.

[2] Neither law nor logic permitted the disclosure of defendant's Federal court legal challenge to the law under which he was being prosecuted. The prosecutor had argued that Dennis's complaint of harassment had "opened the door to everything about the lawsuit." Opening the door, however, does not justify blunderbuss rejoinder. Merely by introducing a new issue, a party does not thereby run the risk that any evidence relating to it, no matter how remote or tangential, will be brought out. *(People v Melendez, supra,* 55 NY2d, at 452.) Rejoinder should be limited to the "subject-matter of the cross-examination [which] bear[s] upon the question at issue." *(People v Buchanan,* 145 NY 1, 24.)

At issue was Dennis's motivation in originally accusing

defendant. Dennis had claimed police harassment, and his resort to the courts was relevant to substantiate that claim. The People never objected to this testimony. Instead, the prosecutor used it as a pretext to reveal defendant's effort to legalize sexual conduct with youths—a separate cause of action to which Dennis was not a party, and, as the prosecutor was later to concede, of which he apparently was unaware. Thus, this testimony had no impeachment value as to Dennis. Its only purpose was to demonstrate defendant's sexual tendencies. There could hardly be any clearer proof of a propensity to engage in illegal sexual conduct than an effort to legalize it—a point that was driven home with telling effect in the prosecutor's summation.

Among the other instances where potent but inadmissible evidence of defendant's sexual tendencies was improperly introduced to prove the crimes with which he was charged was asking Dennis whether his coplaintiffs in the Federal action were the "other boys who refused to testify in the Grand Jury." The inquiry had no relevancy other than to serve to expose the full ambit of defendant's suspected activities. The prosecutor also used the examination of Dennis as a vehicle to reveal the existence of salacious pictures taken from defendant's apartment. Without any reason to believe that Dennis would recognize them, she confronted him with the pictures in a manner so as to leave no doubt about what they depicted or where they came from. Nor, in the context of this trial, did the jury, after the prosecutor broadcasted the title in its presence, need to view the videotape, "An Intimate and Revealing Story in a Russian Boy's School", to know what was portrayed in it.

Finally, the prosecutor's invocation of Divine Authority, coupled as it was with an appeal to "the citizens of this county" to thwart NAMBLA's corruption of their youth, took the summation beyond the pale of routine oratorical excess. It was an incitement to convict on grounds that transcend the evidence and the law. The invocation of extralegal norms in criminal prosecutions has been uniformly disapproved, because of the risk that these norms will usurp the primacy of reason and of law. *(See, People v Wood,* 66 NY2d 374, 381; *People v Torres,* 111 AD2d 885; *People v McCloskey,* 92 AD2d 672, 673; *People v Williams,* 73 AD2d 525; *People v Fields,* 27 NY2d 736.)

Balancing the gravity and pervasiveness of the cited errors against the weight of the admissible evidence, we

cannot find that they were harmless. *(See, People v Crimmins,* 36 NY2d 230.)

■ One final comment is in order. The date of Manny's second uncorroborated, sexual encounter with defendant, which was crucial to establish its legal sufficiency, was an actively contested issue. The court's determination that the incident occurred around Thanksgiving, and therefore in November, was undermined by Manny's testimony, which put Thanksgiving in February, which repeatedly denied even a refreshable recollection of a November incident, and which seemingly referred to circumstances that had been fixed firmly in July. Manny's difficulty in placing this incident in November is further demonstrated by his total inability to relate the date of the incident to the date of his November 21 interview with Sergeant Maginnis. Since the second incident related to a time when corroboration was no longer required, the date of that incident should have been presented to the jury as a question of fact.

Accordingly, the judgment of the Supreme Court, Bronx County (Bernard J. Fried, J.), rendered July 15, 1986, convicting defendant of two counts of sodomy in the second degree and sentencing him to consecutive indeterminate terms of imprisonment of from 3½ to 7 years, should be reversed, on the law, and the matter remanded for a new trial.

CARRO, MILONAS, ROSENBERGER and ELLERIN, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered on July 15, 1986, unanimously reversed, on the law, and the matter remanded for a new trial. Motion by defendant-appellant for leave to file a *pro se* supplemental brief granted.