OPINION OF THE COURT
Jones, J.
We cannot agree with the Appellate Division that, in the circumstances of this case, the admission into evidence of statements taken from defendant in violation of his constitutional rights was harmless beyond a reasonable doubt.
Late in the afternoon of January 24, 1978, the body of Elodie Henschel was found in her New Rochelle apartment by the assistant manager of the building. Investigation disclosed that she had been brutally killed and that two diamond rings which she wore were gone.
In the course of the police investigation, on January 25, 1978 three officers went to the second floor apartment over the ground floor apartment of the deceased and in which her body had been found. On arrival the police found defendant present. The apartment was occupied by the Flaherty family, and Lynn Flaherty was his girlfriend. The police were aware of defendant inasmuch as he had previously voluntarily furnished them with some general information as to having seen a “group of suspicious people” near the scene of the homicide. Although he was not then a suspect, the police brought defendant to police headquarters for questioning. On arrival, without being given his constitutional preinterrogation warnings, defendant was questioned concerning his whereabouts on January 23 and 24, 1978. He. answered that he was a student at the Educage School in White Plains and that on his way to school on January 23, at about 8:55 a.m., he had stopped off at the White Plains Mall and there had tripped over a curb, injuring his knee. He had left the school at noon and had gone with his friend Robert Shafran back to the White Plains Mall and then on to Nicky’s luncheonette on Mamaroneck Avenue, White Plains, where they had remained until 1:00 p.m. Then someone named “Bob” had driven him home where he had stayed until Lynn Flaherty had picked him up at 2:30 and driven him to her home in New Rochelle.
*455 On January 24,1978, according to defendant, his mother had driven him to school but he had not gone in. Instead, he had taken a taxicab to the White Plains Hospital because of his injured knee. After finishing at the hospital, he had gone to the White Plains railroad station, had met Shafran there, and the two had ridden to New York City to buy marihuana for $525. Defendant added that he had known Mrs. Henschel for two and one-half years, as long as he had known Lynn, and had been inside her apartment three times.
Defendant was not arrested on the present charges until a year later on January 26, 1979. A felony complaint was filed on January 27, 1979 and defendant was indicted on January 30, 1979.[1]
Defendant’s motion to suppress the statements that he made to the police on January 25, 1978 was denied by the suppression court which found that defendant had agreed to accompany the officers to police headquarters, that he was not in custody, and that the statements he made were voluntary.
At the trial there was extensive testimony that on January 20, 1978 defendant and a fellow student, Robert Shafran, had discussed the theft of two diamond rings from Elodie Henschel; that defendant told Shafran that he would kill her if he had to; that on January 23, 1978 Shafran made arrangements with Robert Carpenter, another student who had access to his parents’ automobile, to drive defendant and Shafran to the Henschel apartment; that when Carpenter drove them to the apartment they were also accompanied by another friend, Robert Benedict, who had come along for the ride; that at their destination defendant left, saying that he would be back in about 20 minutes; that when defendant returned his manner was jittery, he seemed upset andlooked pale and that there was a bloodlike substance on his hands and clothing; that beneath his coat he was carrying something that looked like a tire iron; that he showed Shafran two diamond rings which appeared to have blood on them; that the four then *456 drove to defendant’s house where defendant and Shafran went in; that once in the house defendant stated, “I killed her”, started to wash the blood from his hands and clothing as well as from the iron that he had had beneath his coat, and told Shafran that he had injured his leg; that defendant later burned his clothes; that defendant and Shafran agreed on an identical alibi; that on the following day Carpenter, after first refusing, drove defendant and Shafran to the White Plains railroad station for a payment of $50; that on the way Carpenter saw the rings; that defendant and Shafran caught a train to New York where they went to the jewelry district and sold the rings to a fence for $2,000 before returning to Westchester County.
The detailed inculpatory testimony just recited came from Shafran,[2] Carpenter and Benedict. The trial court charged that Shafran was an accomplice as a matter of law and left it to the jury under proper instructions to determine whether, as questions of fact, Carpenter and Benedict were accomplices. The jury was also instructed with respect to testimony of accomplices as to the necessity for independent corroborative evidence tending to connect defendant with the commission of the offenses charged.
The jury acquitted defendant of charges of common-law murder, felony murder, robbery, burglary and possession of a weapon, but convicted him of grand larceny in the second degree.
On appeal the Appellate Division affirmed defendant’s conviction, holding that, although defendant’s statements were improperly obtained (citing Dunaway v New York, 442 US 200; and Brown v Illinois, 422 US 590), the evidence of defendant’s guilt was overwhelming and accordingly that the erroneous admission of his statements (characterized as “entirely exculpatory”) was harmless beyond a reasonable doubt.
First, we accept the factual determination implicit in the opinion at the Appellate Division, namely that defendant, then 16 years old, did not voluntarily accompany the police *457 to headquarters and that he was therefore in police custody at the time he made the statements in question. Mrs. Flaherty, Lynn’s mother, testified, as did Lynn (both of whom were in the Flaherty apartment when the police left with defendant), that defendant had objected to going with the police and that he had telephoned to his mother, who had spoken to him and to one of the police officers. Defendant’s mother testified that in the course of that telephone conversation she had advised defendant that he did not have to go with the police and had then told the police officer that defendant was not to go with them without an attorney. For their part the People put only one of the three police officers on the stand, and he testified in conclusory fashion only that the officers had asked defendant to accompany them and that he had agreed to go. The officer testifying had no recollection as to whether defendant had initially objected to going. He did recall that defendant had telephoned his mother but made no reference to the participation of any police officer in that conversation. The police officer said to have spoken to defendant’s mother was not called to the stand. In addition the police report made at the time merely stated that the police had gone to the Flaherty apartment and brought defendant to police headquarters; no entries were made as to what had occurred at the apartment. This record supports the implicit conclusion of the Appellate Division that defendant did not voluntarily accompany the police to headquarters.
Because, as conceded, defendant was not given his constitutional preinterrogation warnings before he was questioned at police headquarters, his constitutional rights were violated, and the erroneous admission of the evidence so obtained calls for reversal of his conviction, unless, as the Appellate Division concluded, the admission of his statements was harmless beyond a reasonable doubt.
At this point we depart in a critical aspect from our agreement with the Appellate Division. We do not disagree that the testimony of defendant’s accomplices, without reference to defendant’s own statements, provided overwhelming proof of defendant’s guilt, assuming as we do that there was the required corroborative evidence. Thus the threshold requirement for harmless error analysis is *458 satisfied (People v Crimmins, 36 NY2d 230, 241). From that point on, however, we disagree.
There is at least a superficial appearance of incongruity in the conviction of defendant on the grand larceny count accompanied by his acquittal on all the other charges arising out of the occurrences of January 23, 1978. That appearance of incongruity suggests that the jury in convicting defendant of grand larceny may have relied on the testimony of Shafran and Carpenter that defendant went to New York City on January 24 to fence the two diamond rings — evidence which related principally to the grand larceny charge — as probative of his actions the preceding day. Additionally the jury may have taken defendant’s statement that he went to New York City on the train with Shafran as supplying the independent evidence necessary to corroborate the testimony of Shafran and Carpenter (assuming they found the latter to be an accomplice). Whether this was taken as corroboration or not,[3] it cannot be concluded that the erroneous admission of the statement from defendant’s own lips that he had indeed gone to New York City with Shafran on the 24th was harmless beyond a reasonable doubt, i.e., that there was no reasonable possibility that the error might have contributed to defendant’s conviction (People v Crimmins, 36 NY2d 230, 237, supra).
In view of this conclusion we do not reach or consider defendant’s other assignments of error.
Accordingly, the order of the Appellate Division should be reversed, defendant’s conviction vacated, his statements suppressed, and the case remitted to Supreme Court for further proceedings with respect to the ninth count in the indictment (that of grand larceny in the second degree).
Chief Judge Cooke and Judges Jasen, Gabrielli, Wachtler, Fuchsberg and Meyer concur.
Order reversed, conviction vacated, defendant’s statements suppressed and case remitted to Supreme Court, *459 Westchester County, for further proceedings with respect to the ninth count of the indictment.

. After suppression hearings, the initial indictment, No. 79-00098-01, was dismissed on September 20, 1979, with leave to represent, and a new indictment, No. 79-00845-01, was handed up on September 28, 1979.

. On September 28, 1979 Robert Shafran had entered a plea of guilty of manslaughter in the first degree in the death of Elodie Henschel with the understanding that if he testified truthfully against defendant, the People would take no position concerning his sentence.

. In view of the reasoning on which we reverse and the absence of any contention that the evidence was insufficient to sustain defendant’s conviction, we have no occasion to consider whether defendant’s statements would have been sufficient as a matter of law to constitute the corroboration required by the statute if the jury found Carpenter as well as Shafran to have been an accomplice of defendant (GPL 60.22).