*35 OPINION OF THE COURT
Simons, J.
Defendant was originally charged with several crimes, including murder, robbery, grand larceny, burglary and criminal possession of a weapon, arising from the death of Elodie Henschel, age 83, and the theft of her two diamond rings. After trial the jury convicted him of the larceny and acquitted him of the remaining charges. On appeal we reversed, ordering suppression of defendant’s statement to the police, and remanded the matter for a new trial on the larceny charge (People v Goodman, 54 NY2d 451). On retrial, defendant was again convicted. On this appeal he contends the judgment must be reversed because the People were permitted to present evidence to the second jury, over his objection that it violated principles of double jeopardy and collateral estoppel, that (1) Ms. Henschel had been beaten to death, (2) defendant had said prior to her death that he intended to steal her rings and that he was willing to kill her to obtain them, and (3) defendant at a time relevant to the murder had blood on his clothes and hands. He concedes that the prior verdicts did not bar the second trial for grand larceny but contends that the People could not introduce this evidence after he had been acquitted of the murder, robbery and related counts in the first trial. For the reasons which follow there should be an affirmance.
The homicide was clearly established. Ms. Henschel’s body was discovered in her apartment in New Rochelle January 24, 1978 by the assistant manager of the building. Investigation disclosed that she had been brutally killed hours earlier by blows to the head and that two diamond rings which she had been seen wearing the day before were gone. There were no signs of a forced entry into the apartment and apparently no other valuables or cash had been stolen.
*36 Defendant knew Ms. Henschel and was generally familiar with the area because his girlfriend lived in the same building. In fact, he was visiting his girlfriend when the police arrived to investigate. While the police were securing the crime scene he volunteered to them that he had seen three suspicious males in the rear of the apartment building the day before.
Defendant’s connection with the incident was established at the first trial by testimony that on January 20, 1978 defendant and a fellow student, Robert Shafran, had discussed the theft of Ms. Henschel’s two diamond rings; that defendant told Shafran that he would kill her to get them if he had to; that on January 23, 1978 Shafran made arrangements with Robert Carpenter, another student who had access to his parents’ automobile, to drive defendant and Shafran to the building in which Henschel lived; that when Carpenter drove them to the apartment they were also accompanied by Robert Benedict who had come along for the ride; that they parked the car about a block from the Henschel apartment and defendant left the others, saying that he would be back in about 20 minutes; that when defendant returned his manner was jittery, he seemed upset and looked pale and his three companions noticed a bloodlike substance on his hands and clothing; that Benedict noticed that defendant was carrying something that looked like "piping” beneath his coat; that he showed Shafran two diamond rings which appeared to have blood on them; that the four then drove to defendant’s house where defendant and Shafran went in; that once in the house defendant told Shafran, "I killed her”, started to wash the blood from his hands and clothing as well as from the tire iron that he had had beneath his coat, and stated that he had injured his leg; that defendant later burned his clothes; that defendant and Shafran agreed on an identical alibi; that on the following day Carpenter, after first refusing, drove defendant and Shafran to the White Plains railroad station for a payment of $50; that during the trip Carpenter saw the rings; that defendant and Shafran caught a train to New York where they went to the jewelry district and sold the rings to a fence for $2,000 before returning to Westchester County.
Most of this evidence linking defendant to the crime came from Shafran, who had earlier pleaded guilty to manslaughter first degree, but Carpenter and Benedict, who had received immunity, each testified to what they did and saw during these events of January 23 and 24. The trial court charged *37 that Shafran was an accomplice as a matter of law but instructed the jury that it must determine whether Carpenter and Benedict were accomplices. It also instructed the jury that the testimony of any accomplice had to be corroborated by independent evidence tending to connect defendant with the commission of the offenses charged. The People presented substantially the same evidence from these witnesses at the second trial and defendant assigns error as a result, claiming the People were estopped from introducing evidence relating to the charges of which he was acquitted.
Collateral estoppel originally developed in civil litigation, but it is now clear that the doctrine applies generally to criminal proceedings as well (see, People v Sailor, 65 NY2d 224, 228; People v Plevy, 52 NY2d. 58, 64-65; People v Berkowitz, 50 NY2d 333, 344; Matter of McGrath v Gold, 36 NY2d 406, 411; United States v Oppenheimer, 242 US 85). It is not applied in quite the same way, however, because the preeminent concern in criminal cases is to reach a correct result whereas in civil litigation the focus is on the swift, impartial and peaceful resolution of disputes. The desire to avoid repetitious litigation must sometimes give way to concerns peculiar to criminal prosecutions (People v Plevy, 52 NY2d 58, 64-65, supra). The term "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit” (Ashe v Swenson, 397 US 436, 443; Matter of McGrath v Gold, supra, at p 411). As we noted in People v Lo Cicero (14 NY2d 374, 380), "[collateral estoppel, as distinguished from the principle of double jeopardy, arises not so much from concern for the peace of mind of the defendant as from a long-recognized equitable reaction against allowing a party to relitigate issues which have already been decided against him.”
The doctrine acquired constitutional dimension when the Supreme Court held in Ashe v Swenson (supra) that it is embodied in the Fifth Amendment guarantee against double jeopardy and is applicable to the States (see, id., at p 446; see also, Benton v Maryland, 395 US 784). It differs from double jeopardy, however, because jeopardy may attach long before the jury has rendered a verdict, whereas collateral estoppel applies only when there has been a final judgment. Moreover, constitutional double jeopardy normally relates only to subsequent prosecutions involving the same offense (see, Brown v Ohio, 432 US 161; Blockburger v United States, 284 US 299; *38 Kepner v United States, 195 US 100; but see, CPL 40.10 et seq.), whereas the expansion of collateral estoppel principles to criminal cases was intended to overcome that narrow view of double jeopardy and prevent the harassment of defendants by serial prosecutions for multiple offenses arising from a single act or group of acts (see generally, Mayers & Yarbrough, Bis Vexari: New Trials and Successive Prosecutions, 74 Harv L Rev 1, 29 [1960]; Note, Twice in Jeopardy, 75 Yale LJ 262, 283-286 [1965]).
Before collateral estoppel may be applied in a subsequent criminal case, there must be an identity of parties (People v Berkowitz, 50 NY2d 333, 345, supra; People v Reisman, 29 NY2d 278, 285; People v Lo Cicero, 14 NY2d 374, 380, supra) and issues (see, People ex rel. Dowdy v Smith, 48 NY2d 477, 482-483; People v Reisman, supra, at p 285) and a prior proceeding resulting in a final and valid judgment (see, People v Fagan, 66 NY2d 815; Matter of McGrath v Gold, 36 NY2d 406, 412, supra) in which the party opposing the estoppel had a "full and fair opportunity” to litigate (see, People v Sailor, 65 NY2d 224, 229, supra; People v Berkowitz, supra, at p 347; Schwartz v Public Administrator, 24 NY2d 65).
Estoppel is asserted customarily in situations involving an acquittal followed by subsequent charges arising from the same incident. It may also apply, however, to a mixed verdict in a single prosecution which acquits defendant of some counts of a multiple count indictment and convicts him of others (see, e.g., United States v Keller, 624 F2d 1154; United States v Venable, 585 F2d 71; see also, United States v Medina, 709 F2d 155; United States v Mespoulede, 597 F2d 329 [involving acquittals as to some counts in the indictment and a hung jury as to others]).
In Ashe v Swenson (397 US 436, supra), the Supreme Court held that estoppel applied to ultimate facts. An ultimate fact is an issue which is the sine qua non of a conviction in the second trial. If the first jury has resolved the issue in defendant’s favor, the effect of that prior determination is to bar prosecution in a second criminal action though the second indictment may charge a different crime (see, United States v Keller, 624 F2d 1154, 1159, supra; United States v Mespoulede, 597 F2d 329, 333, n 6, supra). Ashe illustrates the rule in a case involving an acquittal and a subsequent attempt to prosecute for an offense arising from the same incident. In that case, defendant was acquitted in a prior trial of robbing *39 one of several participants in a poker game. Because there was no dispute that the robbery had occurred, the jury’s verdict necessarily determined that defendant was not present at the time of the crimes. The Supreme Court held that the finding of this ultimate fact foreclosed the government from subsequently trying defendant for the robbery of another of the game’s participants.*
In the case of a mixed verdict, the defendant has been acquitted by the jury of some of the charges in a multicount indictment but, at the instance of defendant, the conviction has been set aside because of trial error. In that situation, the People are not foreclosed by either double jeopardy or collateral estoppel concerns from reprosecuting the defendant on the charge which resulted in conviction. Acquittal on the joined charges does not give rise to a determination of an "ultimate fact” which would bar reprosecution because manifestly, unless the verdict is repugnant or inconsistent, the jury could not have found favorably to defendant on an element of the crime of which it convicted him (see, United States v Jones, 404 F Supp 529, 544, affd 538 F2d 321). Thus, in this case defendant’s acquittal of murder and the related charges could not bar reprosecution of the larceny conviction and defendant does not contend that it does. Rather, he urges us to adopt the rule that collateral estoppel not only bars reprosecution of ultimate facts but also forecloses the introduction or argumentation of evidentiary facts necessarily established in defendant’s favor in the former trial. The rule he urges upon us has been widely recognized as supported either by an expansive interpretation of the Ashe decision, which speaks only of ultimate facts, or by common law, the courts reasoning that, in fairness, a defendant who has satisfied one jury of his innocence of a crime should not be forced at a second trial to refute facts underlying the crime, and necessarily decided in his favor, as if the first trial had never taken place (see, e.g., United States v Mespoulede, 597 F2d 329, 334-335 [2d Cir], supra [constitutional basis]; United States v Venable, 585 F2d 71, 78 [3d Cir], supra [common-law basis]; Wingate v Wain *40 wright, 464 F2d 209, 212-214 [5th Cir] [constitutional basis]; Green v United States, 426 F2d 661 [DC Cir] [common-law básis]; United States v Kramer, 289 F2d 909 [2d Cir] [pre-Ashe common-law basis]; Powers v State, 285 Md 269, 401 A2d 1031 [common-law basis]; Simon v Commonwealth, 220 Va 412, 258 SE2d 567 [constitutional basis]). This rationale is consistent with the protections accorded defendants by our statutes extending double jeopardy protection well beyond constitutional requirements (see, Bellacosa, Practice Commentary, McKinney’s Cons Laws of NY, Book 11 A, CPL 40.10, pp 243-244), with generally recognized concepts of fairness (see generally, Ashe v Swenson, 397 US 436, 446, supra; Simon v Commonwealth, supra, at p 571; Powers v State, supra, at p 1039), and with our stated view that common-law collateral estoppel is generally applicable to criminal proceedings for purposes of conserving the time and resources of the courts and litigants (see, People v Plevy, 52 NY2d 58, 64, supra; People v Lo Cicero, 14 NY2d 374, 380, supra). These concerns do not warrant adoption of the evidentiary fact rule in this case, however, for even if we were to do so, its application would not require reversal of defendant’s conviction.
Application of the collateral estoppel doctrine requires that the court determine what the first judgment decided and how that determination bears on the later judgment (United States v Mespoulede, 597 F2d 329, 333, supra; United States v Kramer, 289 F2d 909, 913, supra; see, Ashe v Swenson, 397 US 436, 444, supra). The rule is easily stated but frequently difficult to implement because the meaning of a general verdict is not always clear and mixed verdicts may, at times, appear inherently ambiguous. Nevertheless, the court must assume the jury reached a rational result (Ashe v Swenson, supra), and a defendant claiming the benefit of estoppel carries the burden of identifying the particular issue on which he seeks to foreclose evidence and then establishing that the fact finder in the first trial, by its verdict, necessarily resolved that issue in his favor (see, United States v Mespoulede, supra, at p 333, and cases cited therein). If he can show no more than that the verdict is ambiguous, he cannot establish that the jury found the evidentiary fact in his favor. The rule is not to be applied with a hypertechnical approach but with realism and rationality by examining all parts of the record of the prior proceeding and concluding from it whether a rational jury could have grounded its decision on an issue other than that which the defendant seeks to foreclose from consideration *41 (Ashe v Swenson, supra, at pp 443-445). The court must also presume that the jiiry appropriately applied the charged substantive and procedural rules of law to the determined events. Thus, although a mixed verdict may appear inconsistent and suggest that the jury established an implausible theory of events, upon closer scrutiny, the verdict may reveal "legal and not factual logic” as a consequence of the jury’s application of a peculiar procedural rule to a reasonably determined factual scenario (United States v Ballard, 586 F2d 1060, 1065; see also, United States v Woods, 484 F2d 127 [involving corroboration]).
Applying these rules, we find a rational basis for the first jury’s verdict which indicates that it did not necessarily find the evidentiary facts defendant objects to in his favor. The critical evidence in this case was the accomplice testimony of Shafran. Only his testimony clearly connected defendant to the crimes charged in all counts of the indictment. It is clear that the jury was acutely aware of the Judge’s instructions that this testimony required corroboration as to each crime because during deliberations they returned to the courtroom several times for further instructions on the subject and to have testimony of various corroborating witnesses read to them. An analysis of the trial record leads inescapably to the conclusion that the jury at the first trial determined that defendant had committed the larceny of Ms. Henschel’s rings during his 20-minute absence from Carpenter’s car because the prosecution presented no other evidence or theory placing defendant in a position to unlawfully take them. Notwithstanding that finding, the jury also found that the evidence linking defendant to Ms. Henschel’s death was insufficiently corroborated. Even if the jury decided that Carpenter and Benedict were not accomplices, the only evidence they offered connecting defendant to the homicide, and there was little else, consisted of the defendant’s 20-minute absence from Carpenter’s automobile while it was parked in his girlfriend’s neighborhood and his return with what they described variously as a pipe or tire iron under his coat and blood on his hands and clothes. The jury was free to discredit this testimony of Carpenter or Benedict, or parts of it, and it must have done so because Benedict corroborated Shafran’s testimony about defendant’s return with a weapon under his coat, evidence which not only could have implicated defendant in the murder and related crimes, but also was sufficient to convict defendant of criminal possession in the fourth degree *42 (see, Penal Law § 265.01). Nevertheless, the jury acquitted him of that charge, a finding that was consistent with its acquittals on the murder, burglary and robbery counts and with other evidence which indicated that there had been no forced entry into Ms. Henschel’s apartment and that the apartment was not in disarray (see, Penal Law § 140.25).
Moreover, defendant does not offer any reason to believe that the jury necessarily found the asserted evidentiary facts in his favor. Instead, he contends, as does the dissent, that the People’s theory in the first trial was that the larceny was committed in conjunction with the murder and related counts, that the evidence would only support this theory and that the jury’s finding that the theft was not committed in conjunction with the murder was inconsistent with the People’s theory and with the evidence. Whatever the People’s theory, however, there was no inconsistency in the jury’s verdicts. To the contrary, they suggest that the jury rationally determined that defendant previously knew Ms. Henschel because she lived in the same building as his girlfriend, that he went to her apartment after she had been killed (or at least that he had not killed her), entered it, and took the rings from the dead body on the floor. If the jury had not accepted the evidence connecting defendant with the victim for the 20-minute period he was absent from Carpenter’s automobile, then it could not have convicted defendant of larceny. That the jury limited its verdict to larceny because of want of corroboration, as the dissent recognizes (dissenting opn, at pp 52-53), only supports the analysis that the jury did not necessarily find the facts in defendant’s favor; it merely found the People had not met the requirement of corroboration (see, United States v Woods, 484 F2d 127, supra; see also, United States v Venable, 585 F2d 71, supra).
Defendant may reasonably contend that the jury’s verdict in the first trial not only foreclosed the People from resubmitting the counts on which he was acquitted but also from advancing a theory that the murder and the theft were committed by the same person. The prosecution did not reargue that theory at the second trial, however. It established that Ms. Henschel had been murdered at some point between 11:00 a.m. on January 23, 1978 and 6:00 p.m. on January 24, 1978 and that defendant had been in close proximity to her body during that period, but it did not attempt to suggest that defendant was her murderer. Indeed, a close reading of the trial record *43 discloses that both the court and the prosecutor were careful to avoid statements suggesting that he was.
Finally, defendant contends that, independent of estoppel principles, the evidence of the Henschel homicide, his prior statement that he was willing to kill to get her rings and his return to Carpenter’s automobile with blood on his person and clothing was not relevant in the larceny trial. There is no doubt that the first jury found that Ms. Henschel had been killed, however, and its verdict did not estop the prosecution from offering evidence at the second trial which supported the theory the first jury apparently adopted. The challenged evidence is relevant because it supports the People’s claim of larceny based upon Goodman’s acquisition of the rings without the victim’s consent. In fact, if the first jury found Ms. Henschel had been alive before defendant obtained her rings, it would, at least, have convicted him of burglary or robbery or both. Defendant’s statement that he would kill Ms. Henschel in order to obtain the rings was similarly relevant to this prosecution because it revealed his intent to commit larceny and the gravity of that intention. Finally, the evidence that defendant returned to Carpenter’s car with blood on himself and his clothing is consistent with lack of consent because the blood revealed that the violence surrounding the victim’s death had occurred before the rings were taken and that she was incapable of consent when they were taken. Whether the probative value of this evidence was exceeded by the danger of undue prejudice to defendant’s case was a matter for the trial court in the sound exercise of its discretion. We find no abuse of discretion in its rulings as a matter of law.
We have considered defendant’s remaining contentions and find them without merit.
Accordingly, the order of the Appellate Division should be affirmed.

People v Dreares (15 AD2d 204, affd no opn 11 NY2d 906), cited by the dissent (dissenting opn, at pp 47-48) also involved a prior acquittal, on a loitering charge, which was used to negate the element of unlawful use of force in a subsequent assault charge. It differs from this case which involves a mixed verdict, and, contrary to the contention of the dissent, it deals with an essential "element” (id., at p 206) of assault, the unlawfulness of the force used by defendant in resisting the unwarranted arrest.