OPINION OF THE COURT
Edward M. Davidowitz, J.
Defendant is charged with attempted murder in the second degree, aggravated assault, attempted aggravated assault, assault in the first degree, criminal possession of a weapon in the second and fourth degrees and criminal use of a firearm in *367 the first and second degrees. He moves for dismissal of the indictment after an inspection of the Grand Jury minutes, suppression of a pistol and statements, various evidentiary hearings and discovery. The indictment alleges that defendant fired at Federal law enforcement agents who broke into his apartment in search of a drug dealer; the drug dealer was not defendant.
This opinion addresses three issues for which there is little or no precedent: are the People collaterally estopped from introducing into evidence against defendant a gun that was suppressed by the United States District Court in a parallel proceeding; are Federal law enforcement agents, under CPL 2.15, "peace” or "police” officers in accordance with CPL 1.20 and 2.10; and should the affirmative defense of justification have been charged to the Grand Jury under the facts of this case?
The transcripts of testimony at the suppression hearing in the District Court, the decisions of Judge Robert W. Sweet on those motions (United States v Nezaj, 666 F Supp 494; United States v Nezaj, 668 F Supp 330), testimony before the Grand Jury in this case, and allegations of fact in support of and in opposition to these applications disclose that the following events ended in defendant’s arrest.
THE ARREST
On February 6, 1987, at approximately 5:00 a.m., agents of the Alcohol, Tobacco and Firearms Bureau (ATF), the Drug Enforcement Agency and the United States Customs Bureau tried to execute an arrest warrant for a man named Enrique Rivadulla at an apartment in Brooklyn. The man who answered the door told the agents that Enrique did not live there anymore. But, he offered to bring them to an apartment at 4601 Henry Hudson Parkway where, he said, Enrique stayed with defendant.
The agents went to the apartment house and questioned the assistant superintendent, Sefik Gunes, who reported that defendant lived in the apartment and that a Hispanic man visited him occasionally. The agents did not secure another warrant, and at 8:00 a.m., while defendant was apparently asleep in a rear, upstairs bedroom, directed Mr. Gunes to knock on the front door. Four or five agents stood on either side of the door while others went to the back of the apartment to cover the rear windows and door. All of them re *368 mained especially quiet so that their presence would not be noted.
Mr. Gunes knocked several times in a "normal manner”, although one agent characterized the knocking as "very hard”. There was no response and Gunes was ordered to step aside. The next series of events are unclear.
According to one agent, when Gunes left, the agents knocked on the door and announced "Police, open up!” Several moments elapsed when they heard movement inside the apartment. The supervising agent then gave the order to knock the door down. The agents used a sledge hammer and pounded on the door with their feet. They continued to announce "police” and the door came down quickly. Mr. Gunes, however, testified that the agents shouted "police” when the door was being knocked down and not before.
The agents rushed.into the dark apartment with guns drawn. They continued to yell "police”. The only light came from the doorway behind them. They wore jackets with the words "police”, or "u.s. agent” in large yellow letters on the back and a round three-inch insignia on the front. Their shields hung from their necks.
Several moments after the entry, defendant fired at the agents and hit one in the cheek. The others shot back. Defendant crawled across an attic space to an adjacent apartment. From there he telephoned the police department and negotiated his surrender.
Emergency Service Unit police officers then conducted a "security sweep”. They found one gun in defendant’s apartment and another in the crawl space between the two apartments.
Police officers from the crime laboratory also searched defendant’s apartment. They had no warrant and discovered a scale, guns, ammunition and heroin inside a safe. The Government then sought and obtained a search warrant and seized the foregoing items.
The Supervisor of the ATF drug task force told the Grand Jury that he asked defendant after his arrest why he shot the agent? Defendant replied that "he didn’t know that they were police and he thought somebody was trying to break into his house”. Defendant alleges in his motion papers that he only observed the outline of persons with firearms and did not know that they were police officers.
*369 THE PROCEEDINGS IN THE DISTRICT COURT
Defendant was indicted in the District Court for attempted murder of a Federal law enforcement officer, use of a firearm in relation to a crime of violence and a crime of drug trafficking and possession of heroin with intent to distribute. He moved to suppress the guns and heroin on the ground that his Fourth Amendment rights were violated. The Government argued that the agents had the right under Payton v New York (445 US 573) to execute the arrest warrant "without further approval by any law enforcement officer at any address” which they concluded was Enrique’s home. The court confined itself to that one "narrow issue”, and held that the agents could not unilaterally make this judgment without first securing judicial approval and granted the motion.
The Government moved to reopen the hearing to present evidence that: the search of defendant’s apartment was an appropriate "security sweep”; the guns and drugs were in plain view while the search was being conducted; and, in any event, the search was attenuated by the "intervening” shooting. The court refused to consider evidence on those issues and denied the motion.
COLLATERAL ESTOPPEL
Defendant alleges that the People are precluded from offering into evidence the gun used for the shooting, which was found in the crawl space. He argues that Judge Sweet’s decisions resolved all the suppression issues and the People are bound by them; they consulted with the United States Attorney’s office, were involved at different stages of the proceedings with planning and strategy and were, therefore, closely enough related for collateral estoppel purposes. The People argue that they were not parties to the Federal court action, had "no control” of that case, did not participate in direction of the prosecution and should not be bound by the court’s decision.
Collateral estoppel, sometimes called "issue preclusion”, prevents parties from relitigating an issue of ultimate fact that was resolved by a valid and final judgment in an earlier proceeding. It applies when the parties are the same, or so closely related that they may be treated as one, the issues are identical, and there was a complete opportunity in the first proceeding to litigate the issues (Ashe v Swenson, 397 US 436, *370 443; People v Goodman, 69 NY2d 32; Matter of McGrath v Gold, 36 NY2d 406; People v Lo Cicero, 14 NY2d 374).
The rule originated in civil actions where the principal concern was the peaceful, swift and impartial resolution of private disputes to conserve time, and the resources of courts and parties (People v Plevy, 52 NY2d 58, citing People v Berkowitz, 50 NY2d 333, 344-345). Different, more pressing concerns, however — such as "the correctness of the result”— are principal considerations in criminal matters and outweigh the need for efficient dispatch of the proceedings. Accordingly, collateral estoppel is not as liberally and flexibly applied (People v Berkowitz, supra; People v Reisman, 29 NY2d 278; People v Fagan, 66 NY2d 815).
The application of collateral estoppel in cases whére the defendant was the same, but the prosecutors were the Federal Government on the one hand, and the State on the other, has not been considered by any reported decision. Issues concerning different State prosecutors were discussed in People v McGriff (130 AD2d 141), which held that the Special Narcotics Prosecutor was estopped from relitigating the validity of a telephone search warrant in the New York County Supreme Court, which had been decided against the Queens County District Attorney in a Queens County Criminal Court and provides guidance for this case. The First Department found that the relationship between the two prosecutors was sufficiently close "for collateral estoppel purposes” (supra, at 150); special narcotics legislation authorized 'coordinated prosecution’ ” and " 'centralized direction’ ” of narcotics indictments throughout the city. (Supra, at 151.) And both cases were special narcotics prosecutions which gave the "relationship an even greater unity of identity”. (Supra, at 151.)
Identity of parties, and the effect on a New York prosecution was also an issue in People v Reisman (supra), where the defendant argued that evidence had to be suppressed because it was secured from information obtained through an unlawful search by California police officers. The court relied on three principles in refusing to invoke collateral estoppel: "in the absence of collusion between the police of the two jurisdictions” evidence otherwise lawfully obtained in New York should not be excluded because of the misconduct of the Los Angeles police; the parties were not the same; and the effect of the unlawful conduct on the New York prosecution was obviously not considered by the California courts. (Supra, at 284.)
*371 Even when the parties are closely related, collateral estoppel is not relevant if the party against whom it is urged did not have a complete opportunity to litigate all the issues in the first proceeding. In People v Plevy (supra) a defendant was not estopped from relitigating a suppression issue where the prior determination would be disputed by testimony which he did not offer in the first case. In People v Fagan (supra) dismissal of charges at a parole revocation hearing did not bar a subsequent prosecution based on the same acts since the People’s incentive to litigate felony charges "would presumably be stronger” than in the revocation hearing. (Supra, at 816.)
The principles and rules developed in these decisions for the application of collateral estoppel simply do not apply to this case. In the first place, the Government and the State are not so closely related that they may be considered the same party; the unity of purpose and close relationship that the court found supported collateral estoppel in People v McGriff (supra) do not exist here. Instead, two independent prosecutors, from different jurisdictions, became involved in the same investigation — nothing more. Communication between the two offices about the case cannot be escalated to the "unity of identity” which existed in People v McGriff.
Second, only one issue — the right of the Government to execute the arrest warrant at defendant’s apartment — was resolved in the District Court; other issues, such as attenuation, or inevitable discovery, were never considered. Accordingly, two basic elements of collateral estoppel are absent and the motion to suppress on this ground is denied. A hearing will be held to determine the lawfulness of the search and seizure by the police.
AGGRAVATED ASSAULT
Defendant alleges that Federal law enforcement officers are not included in the list of police or peace officers in CPL 1.20 (34) and 2.10, which name 72 separate State and local law enforcement officers and agencies. He argues that that omission suggests that the Legislature intended to exclude them as subjects of aggravated assault (Penal Law § 120.11), and moves to dismiss counts 4, 5 and 6, which charge violations of section 120.11.
CPL 2.15 confers peace officer powers upon 19 categories of Federal law enforcement officers (see, CPL 2.20), including the *372 officers named in this indictment. The People contend that their classification in this section is in "recognition of their unique position in” State law enforcement, not because police or peace officer status was being denied them. They also rely upon the 1982 Practice Commentary to CPL 2.15, which reported that 14 categories of Federal law enforcement officers were now awarded "peace officer status” (see, Bellacosa, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11 A, CPL 2.15, 1988 Pocket Part, at 29). For these reasons, the People say, counts 4, 5 and 6 are legally sufficient and should not be dismissed.
The legislative history for CPL 2.15 discloses, first of all, that it was enacted because Federal law enforcement officers enjoyed a special position as agents of the Federal Government, and because their training and certification requirements were not prescribed by the Criminal Procedure Law (see, CPL 2.20, 2.30; Bellacosa, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11 A, CPL 2.15, 1988 Pocket Part, at 29). Therefore, a separate provision was passed to give them peace officer status, power and authority.
Second, the letters and memoranda prepared by sponsors of CPL 2.15 express concern that a major share of the responsibility for law enforcement in New York fell upon Federal agencies. Others said that peace officer status would permit Federal officers to enforce State criminal laws on their own and give the public additional police protection. Still others emphasized the rigid training requirements imposed upon Federal officers, their professionalism and the fact that they often worked closely with police departments on matters of joint concern. All of the supporters suggested that it was important that the credibility of Federal officers be elevated so that they could enforce the Penal Law as officers not just citizens (see generally, CPL 140.25, 2.20), although with certain limits (see, CPL 140.25 [1] [b]; [3] [b]; 2.20 [1] [b], [c], [h]). In any event, the clear intent was to create another, viable law enforcement force with most of the peace officer powers of State law enforcement officers.
The legislative memorandum in support of the aggravated assault statute is consistent with this view and does not suggest that Federal officers were excluded from its terms. Penal Law § 120.11 was enacted in 1980 as part of a gun control legislation program whose purpose was to increase penalties for unlawful possession and use of firearms. It was prepared in response to the "tragic deaths of those police *373 officers who have fallen victim to armed felons” and reflected a deepening concern for their safety. Moreover, the clear trend in law enforcement today is for Federal and State officers to work together on a regular, continuing basis. Joint task forces were created to deal with immediate, pressing concerns, such as the violation of narcotics laws, and for long-range investigations. Officers from both jurisdictions are assigned to each other’s agencies. Cases and allegations of wrongdoing are routinely referred from prosecutors and officers in one jurisdiction to prosecutors and officers in another.
Any view, therefore, that denies protection of CPL 120.11 to Federal officers would frustrate those goals. Nor is it reasonable that the Legislature intended to grant peace officer status and protection to such law enforcement agents as officers employed by a society for the prevention of cruelty to animals, or "bay constables” of certain villages and towns and not major Federal investigative agencies with substantial investigative authority. That view too is inconsistent with the notion of joint cooperation.
The cases relied upon by defendant, all decided before CPL 2.15 was passed, do not support his position. In People v Marrero (71 AD2d 346), the court merely held that a Federal officer was not exempt from prosecution for unlawful possession of a gun (Penal Law § 265.02) under either of two exceptions: as a peace officer in accordance with CPL 1.20 (33); or as a Federal officer whose possession must be duty related (see, Penal Law § 265.20). The issue common to the Federal court cases (United States v Swarovski, 557 F2d 40; United States v Reid, 517 F2d 953; Scanlon v Flynn, 465 F Supp 32) was whether Federal officers had the power to make warrantless arrests in the absence of specific Federal statutory authority for violations of State or Federal law committed in their presence. The courts held that without specific authorization a Federal officer could only act as an ordinary citizen.
JUSTIFICATION
Defendant alleges that he fired in response to a perceived burglary, and that the Grand Jury was not properly instructed on the exculpatory defense of justification (Penal Law § 35.10 [6]; § 35.20 [3]; CPL 210.35 [5]). Therefore, the proceedings were defective (CPL 210.20 [1] [b]; 210.30). The People argue that defendant’s notion that someone was trying to break into his apartment was unreasonable and a justification charge would have been inappropriate.
*374 Generally, the People have wide — but not absolute — discretion when presenting a case to the Grand Jury (People v Pelchat, 62 NY2d 97, 105; People v Rockwell, 97 AD2d 853). They need not present all evidence favorable to the accused, nor uncover evidence which is helpful to him (People v Isla, 96 AD2d 789), nor explore every defense suggested by the evidence (People v Valles, 62 NY2d 36). But they must instruct on exculpatory defenses — which may eliminate criminal liability altogether (People v Calbud, Inc., 49 NY2d 389; People v Valles, supra, at 38) — when a reasonable view of the evidence supports that defense (People v Goetz, 68 NY2d 96). Mitigating defenses, such as extreme emotional disturbance, do not foreclose criminal charges, but simply reduce the degree of crime and need not be charged (People v Valles, supra).
Justification — or self-defense — is an exculpatory defense and must be explained to the Grand Jury when the evidence reasonably suggests that it exists (People v Valles, supra; People v Goetz, supra). The right to use physical force to defend against a burglary is defined in Penal Law § 35.20 (3) as follows: "A person in possession or control of, or licensed or privileged to be in, a dwelling or an occupied building, who reasonably believes that another person is committing or attempting to commit a burglary of such dwelling or building, may use deadly physical force upon such other person when he reasonably believes such to be necessary to prevent or terminate the commission or attempted commission of such burglary.” (Emphasis added.)
The District Attorney’s presentation was balanced, even and complete; he fairly presented evidence which was favorable and unfavorable to defendant. Nevertheless, the proceedings had no real meaning unless the prosecutor also provided the jury with enough information and instruction to make intelligent and informed choices.
The nature of the evidence supported a justification charge; defendant’s statement that he believed that his apartment was being burglarized and comprehensive evidence of the officers’ break-in were before the Grand Jury, and by some objective standards his apprehensiveness could have been considered reasonable (compare, People v Cruickshank, 105 AD2d 325; People v Goetz, supra, at 106; People v Williams, 121 AD2d 145). The Federal agents at first acted surreptitiously and tried to conceal their presence. They only identified themselves as police officers immediately before and as they entered the apartment. On the other hand, they smashed *375 at the door with a sledge hammer; the corridor and apartment were dark; all defendant could see was their outlines and their insignia was not visible. That potential for confusion and misidentification is also illustrated by defendant’s call to the police after his escape and his report that he thought the apartment was being burglarized.
In short, there was substantial evidence to support a justification charge and the Grand Jury should have been given the option to consider it. Accordingly, the proceedings were defective and counts 1 through 8 and count 10 are dismissed. Nevertheless, the People are given leave to re-present those charges to another Grand Jury (CPL 190.25 [6]; 190.30 [6]).
Counts 9, 11 and 12, charging criminal possession of a weapon in the second degree, criminal use of a firearm in the second degree and criminal possession óf a weapon in the fourth degree, are unaffected by this ruling and, therefore, are sustained (People v Pons, 68 NY2d 264).
Since the People are given leave to re-present the matter, a decision on defendant’s other applications will be reserved until a superseding indictment is filed.