People v Hannah T. (2025 NY Slip Op 04330)

People v Hannah T.

2025 NY Slip Op 04330

Decided on July 25, 2025

Appellate Division, Fourth Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on July 25, 2025
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: WHALEN, P.J., CURRAN, SMITH, DELCONTE, AND HANNAH, JJ.

424 KA 23-01418

[*1]THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,
v
HANNAH T., DEFENDANT-APPELLANT. 

DANIELLE C. WILD, ROCHESTER, FOR DEFENDANT-APPELLANT. 
SANDRA DOORLEY, DISTRICT ATTORNEY, ROCHESTER (GRAZINA HARPER OF COUNSEL), FOR RESPONDENT. 

 Appeal from a judgment of the Monroe County Court (Stacey Romeo, A.J.), rendered April 24, 2023. The judgment convicted defendant upon her plea of guilty of manslaughter in the first degree. 
It is hereby ORDERED that the judgment so appealed from is modified as a matter of discretion in the interest of justice by reducing the sentence of imprisonment imposed to a determinate term of five years, and as modified the judgment is affirmed.
Memorandum: Defendant appeals from a judgment convicting her upon her plea of guilty of manslaughter in the first degree (Penal Law § 125.20 [1]). The conviction was the result of an agreement between the then 17-year-old defendant and her then 16-year-old codefendant boyfriend to kill defendant's mother. Codefendant fired the fatal shots and then fled with defendant in her mother's car.
We reject defendant's contention that the waiver of the right to appeal is invalid. The oral waiver, together with the written waiver, establishes that defendant knowingly, intelligently, and voluntarily waived the right to appeal (see People v Malcolm, 231 AD3d 1503, 1504 [4th Dept 2024], lv denied 43 NY3d 931 [2025]; see generally People v Thomas, 34 NY3d 545, 559-564 [2019], cert denied — US &mdash, 140 S Ct 2634 [2020]). That valid waiver forecloses defendant's challenge to County Court's "discretionary decision to deny youthful offender status" (People v Stackhouse, 214 AD3d 1303, 1304 [4th Dept 2023], lv denied 39 NY3d 1157 [2023]; see People v Burch, 234 AD3d 1246, 1247 [4th Dept 2025], lv denied 43 NY3d 1006 [2025]) and her request that we exercise our interest of justice jurisdiction to adjudicate her a youthful offender (see People v Hinson, 229 AD3d 1191, 1191 [4th Dept 2024], lv denied 42 NY3d 1080 [2025]; People v Allen, 174 AD3d 1456, 1458 [4th Dept 2019], lv denied 34 NY3d 978 [2019]).
Although our analysis of sentencing challenges typically stops with the valid appeal waiver, that does not mean that it must stop there. In People v Lopez, the Court of Appeals stated that "[a] defendant's valid waiver of the right to appeal includes waiver of the right to invoke the Appellate Division's interest-of-justice jurisdiction to reduce the sentence" (6 NY3d 248, 255 [2006] [emphasis added]; see Hinson, 229 AD3d at 1191). The Court further stated that "a defendant is free to relinquish the right to invoke that authority and indeed does so by validly waiving the right to appeal" (Lopez, 6 NY3d at 255). However, an agreement between the People and a defendant cannot extinguish our power to independently review a sentence in the interest of justice (see generally People v Seaberg, 74 NY2d 1, 9-10 [1989]). That power cannot be curtailed by the Legislature (see People v Pollenz, 67 NY2d 264, 268 [1986]; see also People v Farrell, 85 NY2d 60, 66 [1995]), and it "involves a type of discretion not reviewable by the Court of Appeals" (People v Thompson, 60 NY2d 513, 521 [1983]; see People v Alvarez, 33 NY3d 286, 294 [2019]). Indeed, "the Appellate Division may be divested of its unique interest-of-justice jurisdiction only by constitutional amendment" (Lopez, 6 NY3d at 255). As such, it cannot be bargained away by agreement between the parties.
The Court of Appeals has cautioned that "in most situations, the appellate courts should honor [appeal] waivers" (People v Callahan, 80 NY2d 273, 280 [1992] [emphasis added]), given the public policy interest in enforcing waivers of the right to appeal (see Seaberg, 74 NY2d at 10; see generally People v Jenkins, 138 AD3d 102, 106 [1st Dept 2016], lv denied 27 NY3d 1070 [2016]). However, courts are often called upon to conduct a balancing test to determine whether such public policy concerns are outweighed by injustice or prejudice to a defendant (see generally People v Mahboubian, 74 NY2d 174, 183-184 [1989]; People v De Lucia, 20 NY2d 275, 278-280 [1967]; see also Maryland v Craig, 497 US 836, 849 [1990]). In conducting those tests, courts must sometimes override a public policy consideration to avoid some larger injustice, such as "inherent prejudice" to a defendant (De Lucia, 20 NY2d at 280).
Thus, we conclude that, "as in most close issues of public policy," this Court "is called upon to strike a fair balance of competing interests" (People v Rivera, 14 NY2d 441, 447 [1964]) when we determine whether to exercise our interest of justice power. Where a sentence is fundamentally unjust and all other safeguards have failed, we are compelled to exercise our constitutionalized interest of justice power to correct the injustice, no matter the validity of the appeal waiver.
Our dissenting colleagues conclude that, because we have not previously engaged in a similar balancing test to modify a sentence, "this Court has failed to recognize that all along it could have reduced sentences as unduly harsh or severe even in the face of a valid appeal waiver." On the contrary, the fact that we have not previously applied such a test is an indication of the infrequency with which this Court is faced with a case in which the fundamental injustice of the sentence outweighs the strong public policy favoring enforcement of appeal waivers. Defendant has presented such a case.
Here, prior to sentencing, defendant submitted a mitigation report, co-authored by a doctor of social work. The report discusses key parts of defendant's personal history and analyzes the factors that may have led to the crime. After suffering neglect and sexual abuse while in the custody of her biological family, defendant was transferred into foster care at the age of six. However, the removal did not serve its intended purpose. Instead, from the age of six until the age of eleven, defendant suffered extreme abuse and torture at the hands of her adoptive parents in Arizona. Together with an adoptive sister, defendant was physically and psychologically abused, including being starved to the point of malnourishment, forced to live outside, often while naked, and made to perform extreme physical exercise as punishment for allegedly "stealing" from her adoptive parents. When defendant was removed from her adoptive home, she weighed approximately 60 pounds and was characterized in a media report as resembling a "concentration camp survivor."
The adoptive parents were arrested and charged with child abuse. After pleading guilty, the adoptive father was sentenced to 14 years' incarceration and the adoptive mother was sentenced to 20 years' incarceration. Prior to their sentencing, defendant wrote a victim statement describing her treatment while in their house, that the adoptive parents would place duct tape over her mouth for days at a time, that she was made to run outside for hours, and that they dressed her like a baby, including by wearing diapers whenever she was inside the home.
At the age of 16, after two additional failed foster placements and a stay at a residential facility, defendant was placed with her biological maternal grandmother in Arizona. However, soon after her grandmother received custody of defendant, she left defendant alone with her mother in New York State. In the months leading up to the crime, defendant's mother physically and psychologically abused defendant, including by slapping her during an argument, threatening suicide when defendant said she wanted to return to Arizona, and, a few days before the killing, refusing to take defendant to a hospital while defendant was miscarrying a pregnancy and experiencing the "worst pain of [her] life."
Based on the extreme abuse, particularly the five years with her adoptive parents, defendant was given multiple clinical diagnoses, including reactive attachment disorder (RAD), conduct disorder, disruptive mood dysregulation disorder, and post-traumatic stress disorder. As explained in the mitigation report, RAD is "a rare psychological disorder found only in people who suffered extreme abuse as children." Individuals diagnosed with RAD cannot form attachments with caregivers and are "often frequently susceptible to forming inappropriately [*2]close relationships with near strangers," which can make them "highly susceptible to being exploited by others."
The mitigation report further states that defendant's cognitive development was significantly impaired by the abuse that she suffered between the ages of six and eleven. Because she could not remove herself from the situation in which she was being abused, "her brain began to numb itself[,] removing her ability to feel the acute horror of what was happening." "Adults who suffer [such] repeated traumas [as children] have been shown to have extreme difficulty in decision making, ethical judgements and moral reasoning" because "[t]he chemical and physical makeup of the brain has been altered." Defendant's cognitive abilities were also impacted by the clinical starvation she suffered. Thus, even more so than other minors, defendant was susceptible to outside influence and unlikely to have understood the consequences of her actions (see generally J.D.B. v North Carolina, 564 US 261, 272 [2011]; Graham v Florida, 560 US 48, 68 [2010]; Roper v Simmons, 543 US 551, 569-571 [2005]).
The record includes a statement from defendant's maternal grandmother. As the only relative speaking on behalf of the victim's family, the victim's mother pleaded for leniency, stating that defendant "already did her time and got enough punishment from life." The record also includes a statement from an officer involved in defendant's arrest, who stated that defendant may have been manipulated by her codefendant.
We have before us strong evidence that defendant has undergone extreme and heinous abuse, which would have entitled her to consideration for sentencing pursuant to the Domestic Violence Survivors Justice Act (DVSJA). Under that statute, a defendant's sentence may be significantly reduced upon a determination that "(a) at the time of the instant offense, the defendant was a victim of domestic violence subjected to substantial physical, sexual or psychological abuse inflicted by a member of the same family or household . . . ; (b) such abuse was a significant contributing factor to the defendant's criminal behavior; [and] (c) having regard for the nature and circumstances of the crime and the history, character and condition of the defendant, . . . a sentence of imprisonment pursuant to [Penal Law §§ 70.00, 70.02, 70.06 or 70.71 (2) or (3)] would be unduly harsh" (Penal Law § 60.12 [1]). Although defense counsel failed to request a hearing on defendant's eligibility for DVSJA sentencing, the record contains more than sufficient evidence in support of each factor. Defendant suffered profound abuse, beginning in her earliest years and continuing through the date of the crime, which occurred a few days after her mother refused to take her to a hospital when she suffered a miscarriage. The mitigation report details how the impact of that abuse contributed to the crime, including defendant's clinical diagnosis of RAD, which made her unable to bond with her caregiver mother and also made her more susceptible to influence from her codefendant boyfriend. Further, the abuse caused defendant to disassociate, reduced her capacity for moral reasoning, and diminished her understanding of the consequences of her actions.
This Court has the inherent power to correct a sentence that "is unjust in its relation to the crime of which the defendant stands convicted" (People v Miles, 173 App Div 179, 185 [3d Dept 1916]; see NY Const, art VI, § 4 [k]; People v Brisman, 43 NY3d 322, 325 [2025]). Under the unique circumstances of this case, including the heinous childhood abuse of defendant and the trauma she suffered as a result, the plea for leniency from the victim's mother, and defendant's lack of personal involvement in the violent act, we conclude that a prison sentence of 25 years is unjust and oppressive in relation to this crime and this defendant, and it must be corrected. Thus, not only is defendant's sentence unduly harsh and severe, but this is the rare case in which the fundamental injustice and prejudice to defendant arising from an unduly harsh and severe sentence outweigh the "legitimate interest in finality" promoted by the enforcement of appeal waivers (Seaberg, 74 NY2d at 10). However, in light of the relevant factors for youthful offender adjudication (see People v Cruickshank, 105 AD2d 325, 334 [3d Dept 1985], affd sub nom. People v Dawn Maria C., 67 NY2d 625 [1986]) and applying the same balancing test, we decline to exercise our interest of justice jurisdiction to adjudicate defendant a youthful offender (see generally People v Saraceni, 153 AD3d 1559, 1560 [4th Dept 2017], lv denied 30 NY3d 913 [2018]).
We therefore modify the judgment as a matter of discretion in the interest of justice by reducing the sentence of imprisonment to a determinate term of five years, to be followed by the five-year period of postrelease supervision previously imposed by the court.
All concur except Curran and Smith, JJ., who dissent and vote to affirm in the following memorandum: In our view, the majority advances an expansive theory of the Appellate Division's authority that is incompatible with both Court of Appeals case law elucidating the scope of that authority and this Court's long-held understanding of its power. In doing so, the majority takes a different view of binding precedent and then bypasses both the preclusive effect of waiver and the principle of party presentation, thereby failing to adhere to traditionally recognized constraints on appellate review. Furthermore, the doctrinal shift undertaken by the majority is, from our perspective, unnecessary because defendant has an available legal remedy to address any undue severity in her sentence—the issue that the majority decides to decide even though defendant has not asked this Court to do so. We submit that this Court's role is to neutrally apply its power of appellate review—both its discretion and its constraints—in unsympathetic and sympathetic cases alike. Inasmuch as the majority, in our view, deviates from that tenet of appellate decisionmaking, and in doing so commits several analytical missteps, we feel obligated to dissent from the majority's sua sponte modification of defendant's sentence.
I
The crime and defendant's upbringing are both undoubtably tragic. After being neglected and abused during early childhood by her biological family, including her biological mother, defendant was removed by child protective services and then adopted by an Arizona couple, who thereafter inflicted years of horrific abuse and torture upon defendant. Following her rescue from her adoptive parents, defendant experienced failed placements as a teenager and was eventually placed with her biological grandmother in Arizona. During an extended visit to New York during the summer before the crime, the biological mother resumed her physical and psychological abuse of defendant, who was then 17 years old, and when the grandmother brought defendant back to the biological mother's home for the holidays later that year accompanied by defendant's boyfriend, the biological mother refused to take defendant to a hospital while she suffered a miscarriage.
The day after the grandmother left defendant and the boyfriend alone with the biological mother, the grandmother received text messages from the biological mother complaining that defendant was refusing to take birth control, as defendant had agreed to do in return for the boyfriend being permitted to stay at the home, and the biological mother thereafter prevented defendant from using her cell phone and told defendant that the boyfriend would need to leave. After the biological mother gave defendant "a dirty look" in the kitchen, defendant returned upstairs where the boyfriend effectively asked her, "Do you want me to do it[?]," to which defendant responded, in essence, "Yeah, get it over with." While defendant remained upstairs, the boyfriend went downstairs and fatally shot the biological mother twice in the back of the head. Defendant and the boyfriend placed the bedrooms in a state of disarray, but left the basement, which was equipped with security cameras, in an orderly fashion. Defendant and the boyfriend then took the biological mother's vehicle and fled the state, after which they were pulled over for speeding in Missouri and then detained. As a result of a coordinated investigation, the police discovered the biological mother's body at her home in New York.
Defendant and the boyfriend were charged in a joint indictment with, inter alia, murder in the second degree (Penal Law §§ 20.00, 125.25 [1]). Following various pretrial proceedings, the matter ultimately advanced to a plea proceeding during which defense counsel represented that, after thorough discussion with counsel of the People's plea offer, defendant had agreed to accept the offer. Under the terms of the plea agreement, defendant would plead guilty to the lesser charge of manslaughter in the first degree (§ 125.20 [1]) and waive her right to appeal in exchange for a sentence including a determinate term of 25 years of incarceration followed by 5 years of postrelease supervision. Defendant thereafter waived her right to appeal and pleaded guilty consistent with the agreement, and County Court accepted the plea. We note that the boyfriend also pleaded guilty to manslaughter in the first degree in exchange for the same sentence received by defendant. During defendant's subsequent sentencing proceeding, the court denied her request to be adjudicated a youthful offender and imposed the negotiated sentence.
Defendant now appeals, contending only that her appeal waiver is invalid or otherwise does not encompass her claim that she should be adjudicated a youthful offender and that the court abused its discretion in denying her youthful offender status or that, alternatively, this Court [*3]should adjudicate her a youthful offender in the interest of justice.
II
The majority concludes that defendant knowingly, intelligently, and voluntarily waived her right to appeal, and the majority does not determine the appeal waiver to be unenforceable on the ground that the bargain was not "fair, free from oppressiveness, and sensitive to the interests of both the accused and the People" (People v Seaberg, 74 NY2d 1, 8 [1989]; see People v Thomas, 34 NY3d 545, 557 [2019], cert denied — US &mdash, 140 S Ct 2634 [2020]; People v Holman, 89 NY2d 876, 878 [1996]; People v Frank, 258 AD2d 900, 900-901 [4th Dept 1999], lv denied 93 NY2d 924 [1999]). The majority further concludes that defendant's valid appeal waiver forecloses appellate review of the court's discretionary decision to deny youthful offender status and her request that this Court exercise its interest of justice jurisdiction to adjudicate her a youthful offender (see People v Pacherille, 25 NY3d 1021, 1024 [2015]; People v Allen, 174 AD3d 1456, 1458 [4th Dept 2019], lv denied 34 NY3d 978 [2019]).
In the past, that would be the end of the appeal because defendant has not succeeded in her challenge to the validity and enforceability of the appeal waiver and the waiver precludes appellate review of the only challenges to the sentence raised in her brief. However, in an analysis that largely reprises the arguments previously made in a concurrence at the Court of Appeals and a dissent at the Third Department (see People v Lopez, 6 NY3d 248, 257-264 [2006, G.B. Smith, J., concurring]; People v Romano, 45 AD3d 910, 916-920 [3d Dept 2007, Cardona, P.J., dissenting], lv denied 10 NY3d 770 [2008]), the majority asserts that a valid appeal waiver imposes no barrier to this Court disturbing a negotiated sentence reached as part of the plea agreement by sua sponte exercising its interest of justice jurisdiction to reduce a sentence to a term it deems just. We disagree.
In our view, the majority's position proceeds from a premise that is at odds with precedent. According to the majority, the Court of Appeals has endorsed the view that the Appellate Division may always exercise its power to reduce a sentence in the interest of justice on its own initiative, notwithstanding the presence of a valid appeal waiver. In support of that notion, the majority isolates statements in Court of Appeals cases explaining that "the Appellate Division may be divested of its unique interest-of-justice jurisdiction only by constitutional amendment" (Lopez, 6 NY3d at 255) and that appeal waivers "do not interfere with the interest of justice jurisdiction of the Appellate Division" (Seaberg, 74 NY2d at 9). The majority understands those statements to represent a determination by the Court of Appeals answering the question whether the Appellate Division, despite the presence of a valid appeal waiver made as part of a plea agreement between a defendant and the People, nonetheless retains the ability to review the severity of the sentence on its own initiative and reduce the sentence in its discretion. When appropriately read in full context, however, those cases show that the Court of Appeals used the abovementioned language to answer the question whether appeal waivers, which operate to foreclose appellate review of the severity of the sentence, constitute an unlawful transgression upon the Appellate Division's interest of justice jurisdiction (see Lopez, 6 NY3d at 255-256; Seaberg, 74 NY2d at 9-10). The Court of Appeals answered that question in the negative.
Indeed, Lopez and Seaberg reflect a rejection by the Court of Appeals of the notion—pressed by the defendants therein—that appeal waivers place an improper limitation upon the Appellate Division's interest of justice jurisdiction to reduce a sentence (see Lopez, 6 NY3d at 255-256; Seaberg, 74 NY2d at 9-10). The Court of Appeals held that appeal waivers do not constitute an unlawful divestiture of the Appellate Division's jurisdiction in that regard; instead, "[a] defendant's decision to waive appeal . . . is simply a decision not to invoke the [appellate] court's review power" (Seaberg, 74 NY2d at 9-10). The Court of Appeals reasoned that "[b]y pleading guilty a defendant forecloses the appellate court from reviewing the merits of the plea bargain in the interest of justice and there is nothing inherently wrong in a defendant similarly electing to foreclose review of a negotiated sentence" by validly waiving the right to appeal (id. [emphasis added]; see People v Callahan, 80 NY2d 273, 285 [1992]). Thus, unlike the unconstitutional legislative restriction that was the subject of People v Pollenz (67 NY2d 264 [1986]), "a bargained-for waiver of the right to appeal . . . does not operate to deprive the appellate court of its jurisdiction of the appeal. Instead, it merely forecloses appellate review of all claims that might be raised on appeal, except, of course, those categories of claims that survive such waivers under [Court of Appeals] case law" (Callahan, 80 NY2d at 285 [emphasis [*4]added]), such as the legality of the sentence and issues that "involve a right of constitutional dimension going to 'the very heart of the process' " (Lopez, 6 NY3d at 255). The right to appellate review of the severity of a lawful sentence is not one of those nonwaivable rights, however (see Seaberg, 74 NY2d at 9).
The concurrence in Lopez, like the majority here, proposed that a historical review of the Appellate Division's inherent, statutory, and constitutional authority to reduce a sentence "ma[d]e[ ] clear that the Appellate Division may always exercise this power regardless of whether a sentence is imposed after the rendering of a jury verdict or after a plea and sentence bargain, even one including a valid waiver of the right to appeal" (Lopez, 6 NY3d at 264 [G.B. Smith, J., concurring]) and further proposed that public policy dictated that "where a defendant enters a plea and sentence bargain that happens to include an unjust (i.e., unduly harsh, severe or excessive) sentence, the Appellate Division, through the exercise of its unique interest-of-justice sentence review/reduction power, should be able to rectify the problem and render a just result" (id. at 263 [G.B. Smith, J., concurring]). The majority in Lopez held otherwise, reasoning that, "[b]y pleading guilty and waiving the right to appeal, a defendant has forgone review of the terms of the plea, including harshness or excessiveness of the sentence" (id. at 256 [emphasis added]).
Given the difficult task of reasonably giving Lopez and its antecedents the majority's preferred reading, the majority argues that a distinction should be drawn between a defendant's right to invoke the Appellate Division's interest of justice jurisdiction to reduce an unduly harsh or severe sentence and the Appellate Division's power to sua sponte review the severity of the sentence in an extraordinary case despite the presence of a valid appeal waiver. However, that precise argument was raised in Lopez (see brief for defendant-appellant Lopez at 9-28; brief and appendix for appellant Nicholson, available at 2005 WL 3863390, *13-38) and, in contrast to the concurring opinion, nowhere in the majority opinion does the Court of Appeals set forth that distinction as logically or analytically sound (see Lopez, 6 NY3d at 253-257). The Court of Appeals has instead repeatedly described the right waived without making any such distinction (see e.g. Thomas, 34 NY3d at 559 n 2 [describing "the intermediate appellate court's review in the interest of justice of the severity of the sentence" as one of "the waivable rights that are the typical subject of appellate waivers"]; Lopez, 6 NY3d at 255 ["By waiving the right to appeal in connection with a negotiated plea and sentence, a defendant agrees to end the proceedings entirely at the time of sentencing and to accept as reasonable the sentence imposed"; "By pleading guilty and waiving the right to appeal, a defendant has forgone review of the terms of the plea, including harshness or excessiveness of the sentence"]; Seaberg, 74 NY2d at 10 ["By pleading guilty a defendant forecloses the appellate court from reviewing the merits of the plea bargain in the interest of justice and there is nothing inherently wrong in a defendant similarly electing to foreclose review of a negotiated sentence"]). Other Departments have similarly understood Lopez and its antecedents as standing for the proposition that a valid appeal waiver precludes any discretionary disturbance of the sentence by the Appellate Division (see e.g. People v Rosario, 204 AD3d 703, 704 [2d Dept 2022] ["The defendant's valid waiver of his right to appeal further prevents this Court from modifying the defendant's sentence in the interest of justice"]).
The Third Department's discussion of the issue in Romano (45 AD3d 910) is illustrative of the present state of the law and offers a refutation of the theory advanced by the majority in the present case. In Romano, the dissent expressed its concern with language contained in the majority decision that, according to the dissent, "could lead to a conclusion that a defendant's valid waiver of the right to appeal does not just restrict that defendant's own right to request that [the Appellate Division] invoke its interest of justice jurisdiction to reduce a sentence . . . but, further, leads inexorably to a restriction of [the Appellate Division's] own constitutionally mandated authority to exercise that jurisdiction in cases where we deem it appropriate despite the presence of a valid appeal waiver" (id. at 918-919 [Cardona, P.J., dissenting] [emphasis omitted]). The majority rebuffed the dissent, noting in particular that the dissent's concern was more properly directed at the Court of Appeals because its precedent had definitively resolved the issue by holding that a valid appeal waiver did not interfere with the interest of justice jurisdiction of the Appellate Division but did foreclose review of the severity of a negotiated sentence (id. at 913 n 2).
Like the majority in the present case, the dissent in Romano also asserted that, even if a defendant validly waived the right to appeal and thus could not invoke their right to request that [*5]the Appellate Division reduce the sentence in the interest of justice, nothing prevented the Appellate Division from exercising that authority on its own when confronted with an unjust sentence (see id. at 918-919 [Cardona, P.J., dissenting]). Again, the Romano majority rejected that proposition. The majority pointed out that, under Court of Appeals precedent concerning a plea agreement with an appeal waiver, " '[a] defendant may not subsequently eviscerate that bargain by asking an appellate court to reduce the sentence in the interest of justice—realistically an issue that as a practical matter is brought to an appellate court's attention only when raised by defendants' " (id. at 913, quoting Lopez, 6 NY3d at 255-256 [emphasis omitted]). Then, rejecting the notion advocated by the dissent that the Appellate Division could reduce the sentence on its own anyway, the majority reasoned that the bargain would be "similarly eviscerated, contrary to the well-established public policy of this state, when an appellate court purports to honor a defendant's waiver by rejecting a challenge to the excessiveness of a sentence as barred by an appeal waiver, but then reduces the sentence—just as requested—and deems the reduction to be 'sua sponte' " (id. at 913-914). The majority also noted that "[s]uch an action on [the Appellate Division's] part would, of course, also reflect a fundamental misunderstanding of the term 'sua sponte,' which is defined as '[w]ithout prompting or suggestion; on its own motion' (Black's Law Dictionary 1464 [8th ed 2004])" because "[r]eduction of [a] defendant's sentence in the interest of justice, as requested, would not be 'without prompting or suggestion'; rather, it would be an action taken upon [the] defendant's appeal, not 'on [our] own motion,' regardless of whether we claimed to be upholding the appeal waiver or not" (id. at 914 n 3). The majority then made its assessment even more explicit: "[T]he Court of Appeals has repeatedly held that the Appellate Division does not have the power to reduce a defendant's sentence under such circumstances" (id. [emphasis added]).
The majority in Romano even recognized that the Third Department had previously taken the position—i.e., the position now reprised by the majority in the appeal presently before this Court—that the Appellate Division "has the power to modify a prison sentence in the interest of justice . . . , even in cases where the defendant has waived the right to appeal from the judgment of conviction" (People v Price, 286 AD2d 802, 802 [3d Dept 2001], lv denied 97 NY2d 686 [2001], citing People v Coleman, 281 AD2d 653 [3d Dept 2001]). In the wake of Lopez and its antecedents, however, the Third Department disavowed those decisions to the extent that they failed to recognize that a valid appeal waiver forecloses review of a negotiated sentence, expressly declaring that the relevant rationale articulated in the Pricei>/Coleman line of cases "should no longer be followed" (Romano, 45 AD3d at 913 n 2).
In addition to being contrary to the judiciary's precedent and understanding, the position taken by the majority in the instant appeal that the Appellate Division is presently entitled to exercise its discretion to reduce a sentence in the interest of justice, even when confronted with a valid appeal waiver, is incompatible with the view of the legislature. Indeed, there is currently proposed legislation pending in both chambers to amend CPL 470.15 to provide intermediate appellate courts with the power to modify a sentence as unduly harsh or severe "notwithstanding an otherwise enforceable waiver of appeal" (2025 NY Senate Bill S330, 2025 NY Assembly Bill A322). In recognition that defendants who plead guilty are often required to waive their rights to an appeal in order to obtain the bargain and thereby "waiv[e] their rights to challenge crucial errors in their sentencing," the legislature has proposed to change that current state of affairs in order to "secure the right of a defendant to seek out a remedy to unjust sentences" by "mak[ing] it possible for courts to review" whether the sentence is unduly harsh or severe, even in cases involving valid appeal waivers (2025 NY Senate Bill S330 [emphasis added]).
More generally, the majority in the present appeal further asserts that the statement of the Court of Appeals in Callahan that, "in most situations, the appellate courts should honor [appeal] waivers" (80 NY2d at 280 [emphasis added]) stands for the proposition that the enforcement of valid appeal waivers is merely optional for the Appellate Division. In our view, that is inaccurate. When considered in context, it is clear that the Court of Appeals was making the point in Callahan that appeal waivers are ordinarily enforceable, and therefore appellate courts should enforce such waivers as a matter of judicial policy unless confronted with the traditional grounds for nonenforcement or inapplicability of the waiver—e.g., the waiver was not "knowingly, intelligently and voluntarily made" or the specific legal issue falls within one of "several categories of appellate claims that may not be waived because of a larger societal interest in their correct resolution" (80 NY2d at 280). Callahan thus does not stand for the proposition that the Appellate Division has the unbridled option to disregard the preclusive effect [*6]of valid appeal waivers.
In People v Bryant (28 NY3d 1094 [2016], revg 137 AD3d 401 [1st Dept 2016]), decided a decade after Lopez, the Court of Appeals confirmed by its disposition of the appeal that it does not consider the Appellate Division to possess the authority claimed by the majority here. In Bryant, the First Department, over a dissent maintaining that the defendant's valid waiver of the right to appeal foreclosed any reduction of sentence, determined that the appeal waiver was invalid and then exercised its discretion in the interest of justice to reduce the sentence imposed by the sentencing court as part of the judgment (see 137 AD3d at 401-402). On appeal by the People, the Court of Appeals unanimously concluded that the appeal waiver was valid and that the First Department had erred in holding otherwise (see 28 NY3d at 1096). If, as posited by the majority, the Appellate Division always has the ability to exercise its power to reduce a sentence in the interest of justice on its own initiative, notwithstanding the presence of a valid appeal waiver, then the proper disposition of the appeal in Bryant would have been for the Court of Appeals to remit the matter to the First Department to determine whether it still wanted to reduce the sentence despite the valid appeal waiver. To do otherwise would, under the majority's theory, both deprive the Appellate Division of its unique constitutionalized power to review and reduce a sentence in the interest of justice and deny the defendant the opportunity to retain a just sentence. The Court of Appeals, however, did not dispose of the appeal by remitting to the First Department for that purpose. Instead, the Court of Appeals reversed the order of the First Department and reinstated the judgment of the sentencing court (see id. at 1095). The disposition of the appeal in Bryant by the Court of Appeals is therefore consistent with the view embodied in Lopez and its antecedents and progeny that—contrary to the majority's assertion—a valid waiver of the right to appeal waives "the intermediate appellate court's review in the interest of justice of the severity of the sentence" (Thomas, 34 NY3d at 559 n 2; see Lopez, 6 NY3d at 255-256; Seaberg, 74 NY2d at 9-10).
To the extent that the majority implies that its determination in this case is not reviewable by the Court of Appeals inasmuch as this Court is reviewing and reducing defendant's sentence as a matter of discretion in the interest of justice, we disagree with that suggestion because, in actuality, "an appeal does lie to consider the narrow issue concerning the legality of [this Court's] corrective action" (People v Dawn Maria C., 67 NY2d 625, 627 [1986]; see CPL 450.90 [2] [b]; 470.10 [3]). In dissent, we do not address the substance of the majority's merits determination whether defendant's sentence should be reduced as unduly harsh or severe; rather, we dispute on the law the majority's assertion that the Appellate Division may disregard the preclusive effect of a valid appeal waiver to sua sponte reach the issue of the severity of the sentence.
III
The newfound authority of the Appellate Division to address the severity of a sentence on its own despite a valid appeal waiver, which the majority represents as having always been present, is inconsistent with prior cases involving defendants with arguably similar circumstances whose sentences went unreviewed by this Court on appeal due to the presence of a valid appeal waiver. Likewise, the majority's adoption and application of the concurrence-based reasoning from Lopez does not conform to this Court's prior treatment of a request by a defendant to adopt that rationale (see People v Kemp, 70 AD3d 1301, 1301 [4th Dept 2010], lv denied 14 NY3d 889 [2010]; brief for defendant-appellant, available at 2010 WL 9473173, *10-11). The implication of the majority's position is that, for decades at least, this Court has failed to recognize that all along it could have reduced sentences as unduly harsh or severe even in the face of a valid appeal waiver, if only it had understood that it could engage in a public policy balancing analysis to determine whether the circumstances warranted bypassing the valid appeal waiver.
As discussed above, however, this Court, post-Lopez/Seaberg, has never understood its discretionary power to review the severity of a sentence in the face of a valid appeal waiver as broadly as the majority proposes, and at least one Department that had viewed its authority that expansively has since persuasively disavowed that approach (see Romano, 45 AD3d at 913 n 2). In our view, by changing the approach now, the majority's position will allow this Court to eviscerate plea agreements with valid appeal waivers at its discretion, thereby "render[ing] . . . valid waiver[s] of appeal meaningless" with respect to negotiated sentences (People v Jenkins, 138 AD3d 102, 106 [1st Dept 2016], lv denied 27 NY3d 1070 [2016]) and violating the principle that "[t]he important goals of fairness and finality in criminal matters are accomplished only [*7]insofar as the parties are confident that the carefully orchestrated bargain of an agreed-upon sentence will not be disturbed as a discretionary matter" (Lopez, 6 NY3d at 256 [internal quotation marks omitted]; see Romano, 45 AD3d at 913-914; see also Jenkins, 138 AD3d at 106).
IV
Even beyond its unprecedented departure from case law and this Court's prior understanding and practice with respect to enforcement of valid appeal waivers in the context of reviewing the severity of a sentence, the majority seemingly breaks new ground by reducing defendant's sentence even though defendant has not asked this Court to afford her that relief. In our view, the majority's apparently unprecedented decision to sua sponte modify defendant's sentence as a matter of discretion in the interest of justice is improper inasmuch as it violates the longstanding, traditionally recognized constraint on the scope of appellate review that an appellate court resolve appeals within the framework of the arguments presented by the parties.
With respect to the sentence, defendant contends in her appellate brief only that the court abused its discretion in denying her youthful offender status or that, alternatively, this Court should adjudicate her a youthful offender in the interest of justice. Defendant does not contend that her negotiated sentence should be reduced on the ground that it is unduly harsh and severe. Again, in the past, this Court would not consider the severity of a sentence if that issue was not raised in a defendant's appellate brief (see People v Davis, 188 AD3d 1731, 1732 [4th Dept 2020], lv denied 37 NY3d 991 [2021]). That is because it has been well understood that appellate courts " 'are not in the business of blindsiding litigants, who expect [such courts] to decide their appeals on rationales advanced by the parties, not arguments their adversaries never made' " (People v Sargeant, 230 AD3d 1341, 1353 [2d Dept 2024], quoting Misicki v Caradonna, 12 NY3d 511, 519 [2009]). Yet, casting aside that previously recognized constraint, the majority now grants relief that defendant never requested and the People never had the opportunity to oppose (cf. Davis, 188 AD3d at 1732). Indeed, doing so "pose[s] an obvious problem of fair play" (Misicki, 12 NY3d at 519), particularly toward the People, who have been deprived of any ability to defend before this Court the terms of the sentence that they negotiated below. By reaching the unraised sentencing issue, the majority improperly fails to recognize that, " '[w]hile appellate judges surely do not sit as automatons, they are not freelance lawyers either' " (Sargeant, 230 AD3d at 1353, quoting Misicki, 12 NY3d at 519).
V
In creating its exception to the enforcement of valid appeal waivers for sentences deemed unjust by the Appellate Division, the majority proposes a test—which uses language borrowed from the dissent in Romano (45 AD3d at 919 [Cardona, P.J., dissenting])—to determine whether the exception applies. According to the majority, "[w]here a sentence is fundamentally unjust and all other safeguards have failed, [the Appellate Division is] compelled to exercise [its] constitutionalized interest of justice power to correct the injustice, no matter the validity of the appeal waiver."
The majority seems to want to limit invocation of the exception to those appeals involving "unique circumstances" where the sentence would be " 'unjust in its relation to the crime of which the defendant stands convicted' " (majority mem, quoting People v Miles, 173 App Div 179, 185 [3d Dept 1916]; see Lopez, 6 NY3d at 259-260 [G.B. Smith, J., concurring] [relying upon the same quote from Miles]). We have little confidence that the proposed test will constrain the exception. Inevitably, the test will simply collapse into this Court's standard assessment of whether a sentence is unduly harsh and severe. After all, what is a determination by the Appellate Division that a sentence is unjust under circumstances that only it can correct but another way of saying that the circumstances warrant intervention by the intermediate appellate court to reduce an unduly harsh or severe sentence as a matter of discretion in the interest of justice (see CPL 470.15 [6] [b]; People v Brisman, 43 NY3d 322, 328-329 [2025])?
We are also deeply concerned that the majority's theory about the scope of this Court's constitutionalized interest of justice jurisdiction will not remain confined to the review of the severity of sentences. Indeed, the articulated rationale underpinning the majority's approach to that power (see Miles, 173 App Div at 185) appears unbounded and, if applied in other contexts [*8]of criminal law, would allow this Court to reach an assortment of issues that were previously considered foreclosed by a valid appeal waiver. The majority, in fact, proves our concern justified in this very case by applying its admittedly new test to defendant's request that this Court exercise its interest of justice jurisdiction to adjudicate her a youthful offender.
Even if we were to accept the majority's proposed test on its own terms, defendant's case would fail to meet it. As the majority acknowledges, defendant appears to have a strong case for entitlement to an alternative sentence as a victim of domestic violence pursuant to Penal Law § 60.12 as amended by the Domestic Violence Survivors Justice Act. Yet, defense counsel did not request a hearing to determine whether defendant should receive such a sentence. Defendant therefore seemingly has a colorable ground upon which to base a motion pursuant to CPL article 440 for ineffective assistance regarding defense counsel's failure to seek an alternative sentence or their negotiation of the terms of the sentence (see People v Linda R.M., 236 AD3d 1488, 1488-1489 [4th Dept 2025], lv denied — NY3d — [2025]; cf. People v Riley, 221 AD3d 1162, 1162-1164 [3d Dept 2023], lv denied 40 NY3d 1094 [2024]). Inasmuch as defendant has at least one available legal remedy to address any undue severity in her sentence, it cannot be said under the majority's proposed test that "all other safeguards have failed" such that this Court is justified in taking the extraordinary step of disregarding the preclusive effect of defendant's valid appeal waiver. Given those circumstances, the majority's aberrant decision to bypass the preclusive effect of a valid appeal waiver, sua sponte raise the issue of severity, and then reduce defendant's sentence is not only unprecedented, it is unnecessary.
* * *
In a system that largely resolves criminal charges by plea, it may be preferable for the sake of justice that appeal waivers, now so commonly required as part of plea agreements, not foreclose the Appellate Division from exercising its power to reduce a sentence in the interest of justice on its own initiative (see Lopez, 6 NY3d at 257-264 [G.B. Smith, J., concurring]), or even that appeal waivers are legislatively or judicially declared invalid per se as a matter of public policy (see Thomas, 34 NY3d at 587-599 [Wilson, J., dissenting in part and concurring in part]). Those determinations, however, are the prerogative of the legislature or the Court of Appeals, not this Court. The Court of Appeals is entitled to revisit its interpretation of the Appellate Division's authority to modify a sentence despite the presence of a valid appeal waiver by giving Lopez and its antecedents the majority's preferred reading and adopting the views expressed by the concurrence in Lopez and the majority here. In the meantime, "even if [the Appellate Division] do[es] not agree with the rules of law set forth in the decisions of the Court of Appeals, [the Appellate Division is] bound to follow those rules" (Romano, 45 AD3d at 913 n 2). For all of the foregoing reasons, we respectfully dissent.
Entered: July 25, 2025
Ann Dillon Flynn
Clerk of the Court